THE STATE ex rel. UNITED RAILWAYS COM-
PANY and BLUFF SCENIC RAILWAY COM-
PANY v. JOHN W. WIETHAUPT et al., Judges
of County Court.

In Banc, December 17, 1910.

1. **CONSTITUTIONAL LAW: Title: Misleading.** If the de-
sign of the promoters of an act, in choosing a title for it,
was to mislead the public and the members of the General
Assembly as to its objects, or to prevent a careful consider-
ation of the bill before its enactment, or, whether that was
the design of its promoters or not, if that was the title's
effect, the act is invalid.

2. ———: ———: ———: **Wrong Chapter:** A misstatement
in the title of the number of the chapter in the Revised Statutes
to be amended by the act will not alone render the act invalid,
if there goes along with that wrongful number some other
word, such as "Ferries," "Conveyances," "Wills," which of itself
would indicate more clearly the chapter to be amended than its
correct number would.

3. ———: ———: ———: **Germane.** A title which proclaims
that the purpose of the act is to amend a chapter of the
Revised Statutes entitled "Ferries" gives no notice that the
purpose of the act is to authorize the county courts to estab-
lish wharfs and piers on the banks of rivers, lakes and
creeks outside of cities and towns, and to that end condemn
private property to the extent of one acre and pay the dam-
age, and to have the control and management of the same
and by proper record orders regulate the use thereof. Es-
pecially should that be the holding when the body of the
act is a radical departure from the law that has for long
years regulated the licensing of ferries, invests the county
court with a power of eminent domain it had not previously
possessed, and the journals of the two houses show the bill
was referred in both houses to the Committee on Agriculture
whereas it would ordinarily go to the Committee on Judiciary,
and on its passage no vote was cast against it in one house
and only one in the other. Wharfs and piers are not
limited in their use to the landing of ferry boats, are not
necessary to the operation of ferry boats and are not con-
structed primarily for that purpose, though they may be so
used. Nor is the power of condemnation necessary to the

231 Sup.—29

State ex rel. v. Wiethaupt.

establishing of a ferry. A ferry landing is usually obtained by the boat owner from the riparian owner unless the ferry connects with the two ends of a public road like a bridge. The body of the act is not germane to the title.

4. **FERRIES: Definition.** A ferry is a means of transportation by boat across a stream or other body of water from one end of a public road to the other. It presupposes a road traveled by the public which is bisected by a water course, the ferry serving in a different way the purpose served by a bridge. A ferry is an incident to the use of the road, and presupposes the existence of the road.

5. **CONSTITUTIONAL LAW: Title: Ferries: Two Subjects.** A title declaring the purpose of the act is to amend the chapter of the Revised Statutes entitled "Ferries" by adding six new sections relating to the establishment of wharfs, piers and ferry landings, either mentions wharfs and piers as incidental to ferry landings, or if that is not the sense in which they are used the title embraces more than one subject.

6. ———: ———: ———: **Misleading.** Such title by the use of the word "Ferries" is misleading, since, used as it is in the title, it implies that the wharfs, piers and ferry landings mentioned therein are to be used in aid of ferries, whereas the wharfs and piers called for by the act are not required to be in aid of ferries, and may be established though there is no ferry in existence or in contemplation.

7. ———: **Condemnation: Private Use: Wharf.** An act which empowers the petitioners in a condemnation procedure to get possession of lands for their own private use, is unconstitutional. And where the only motive that appears from the record for the proceeding to condemn a wharf on a lake near a big city is to enable competitors of the present wharf owners to promote their business of furnishing pleasure boats, refreshments and amusements to visitors to the lake, for gain, the use is not public; and if the act authorizing the condemation would, if given effect, accomplish that purpose, it will be held to to be invalid.

8. ———: **Act of June 1, 1909: Wharfs.** The act of June 1, 1909, being article 2 of chapter 48 and sections 6498 to 6501 of the Revised Statutes of 1909, and relating to the establishment of wharfs and piers by county courts on lakes or water courses outside of cities and towns, and permitting such courts to condemn lands for that pretended purpose, is unconstitutional and void.

Prohibition.

PEREMPTORY WRIT AWARDED.

*Boyle & Priest, J. C. Kiskaddon* and *T. M. Pierce* for relator United Railways Company; *Geo. W. Wolff* for relator Bluff Scenic Railway Company.

(1) In the construction of any statute, the history and reason for its enactment may always be invoked in its construction. State v. Balch, 178 Mo. 409; Black on Interpretation of Laws, p. 212. (2) The act approved June 1, 1909, is inoperative and void in that the title is not expressive of the subjects contained. St. Louis v. Wortman, 213 Mo. 139; St. Louis v. Weitzel, 130 Mo. 616; Cooley on Constitutional Limitations (7 Ed.), p. 205. Can it be reasonably or logically said that a title is good as a sign board or indicator which informs the public that the subject of the proposed law will deal with the creation of a fish commission or the licensing of ferrymen, and yet provides for the condemnation of land through the power of eminent domain vested in the county court? Is a title sufficiently explanatory, comprehensive, and fair, which declares that six new sections will be added to a then existing law and yet adds seven? (3) The act of June 1, 1909, is amendatory, and in order to have validity the new matter must be germane to the old, and it is necessary, in making amendments, that the graft be related to the tree and at least of the same genus. St. Louis v. Tiefel, 42 Mo. 590. The act deals exclusively with condemnation of land. The act amended dealt with matters pertaining to the creation of a fish commission or the licensing of ferrymen. Beyond question, there can be no relationship between the taking of land under the right of eminent domain and the creation of a commission of a piscatory nature, nor has the licensing of ferrymen any connection with such a real estate enterprise. A ferry is neither an interest in nor an incident to land. Stark v. Miller, 3 Mo. 470. (4) The act is void because it is in conflict with article 2, section 20,

of the Constitution of Missouri. A ferry is a prolongation of a public road, and in a general sense is a highway over narrow waters, and is a continuation of the highway from one side of the water over which it passes to the other, and is for the transportation of passengers or of travellers, with their teams and vehicles and such other property as they may carry or have with them. Words and Phrases, p. 2749. Unless, therefore, one side of a ferry landing will be met on the other side of the body of water to be crossed by a public road it is not a public ferry in the legal sense, but only a private landing. The question, as provided in the Constitution, is one for judicial determination, and a legislative declaration will not make it so. R. S. 1909, sec. 2626. (5) The act is contrary to article 2, section 30, of the Constitution of Missouri, which provides that no person shall be deprived of life, liberty or property without due process of law. Suppose the land sought to be condemned is condemned. Who is to erect the wharf, and how is the money to be found to carry on the work? The act does not provide that the wharf shall be built and maintained at public expense, and therefore if the act is efficacious we would have the land of the relators taken for a perfectly vain and empty purpose, so far as the public is concerned. Whoever would erect such a wharf must do so, not from charity or from public spirit, but for private gain.

*Stevens & Stevens* and *A. E. L. Gardner* for respondents.

(1) The object of section 28, article 4, of the Constitution is to prevent fraud and imposition on the Legislature, and log-rolling and deceit, and engrafting into an act something not intended to be acted upon by the legislators passing the bill. State ex rel. v. Ransom, 73 Mo. 80; Hannibal v. County of Marion, 69 Mo. 571; State v. Miller, 45 Mo. 498; State v. Bennett, 102 Mo. 364; State v. Deering, 92 S. W. 489; O'Brien v.

Ash, 169 Mo. 299. It is to prevent surprise upon the lawmakers by the passage of bills, the object of which is not indicated by their titles; also to prevent the combination of two or more distinct and unconnected matters in the same bill. State v. Cantwell, 179 Mo. 260. (2) Section 28, article 4, of the Constitution, providing that no law shall relate to more than one subject, which shall be expressed in the title, simply requires that the title shall give information of the general subject of the act and that the act shall not contain provisions not pertaining thereto. In re Burris, 66 Mo. 442. The title must be a fair index of the subject-matter of the bill. State ex rel. v. Miller, 100 Mo. 439; State ex rel. v. Macklin, 135 Mo. 680. The subjects embraced in the bill shall be fairly germane to that recited in the bill. State v. Bennett, 102 Mo. 356. It is sufficient if the title of a statute does not mislead as to the general topic of the act, and if minor features thereof have a reasonable and natural connection with the subject named in the title. O'Brien v. Ash, 169 Mo. 283. (3) The Constitution does not require that the substance of the act shall be embraced in the title. In re Burris, 66 Mo. 442. It does not require the title to designate the purpose of the act. State v. Cantwell, 179 Mo. 245. It does not require a table of contents as a caption to a law. It is sufficient if the title does not mislead as to the general topic of the act and that the minor features of it have a reasonable and natural connection with the subject named in the title. State ex rel. v. Marion Co., 128 Mo. 441; State ex rel. v. Miller, 100 Mo. 439; Lynch v. Murphy, 119 Mo. 163. Mere generality in the title will not vitiate an act of the General Assembly, unless the title is of such a nature as to compel the conviction that it was designed to mislead as to the subject dealt with. State ex rel. v. Marion County, 128 Mo. 441; O'Brien v. Ash, 169 Mo. 299; State ex rel. v. Macklin, 41 Mo. App. 339; State ex rel. v. Bronson, 115 Mo. 272; Elting v. Hickman, 172 Mo. 237; Shively v.

Langford, 174 Mo. 535. The act above quoted complies with every rule that is laid down in the above authorities. It relates to only one subject-matter, the condemnation of wharf and ferry landings by county courts, which is clearly expressed in its title. (4) There being no constitutional provision declaring an act void by reason of the misnomer of the article and chapter or section to be amended, if there is sufficient description of the subject-matter of the act in the title, such misnomer of the article and page and section sought to be amended is mere surplusage, and the act for that reason is not unconstitutional. An act is not void because its title misrepresents the date of the act to which it is supplementary. Railroad v. Van Ness, Fed. Cas. No. 830; 4 Cranch C. C. 594; Morgan v. Des Moines, 54 Fed. 456; State v. Slowes, 81 Ia. 615; Harper v. State, 109 Ala. 28; Saunders v. PM. of P., 24 Fla. 226; Dowder v. State, 74 Ga. 12. An otherwise void statute is not rendered inoperative by an erroneous reference to a previous law intended to be amended. School District v. School District, 73 Ill. 249; Clare v. State, 68 Ind. 17; Ray v. Jeffersonville, 90 Ind. 577; Railroad v. Haugh, 142 Ind. 254; Commonwealth v. Costell, 4 Ky. L. R. 623; Willis v. Wabon, 48 Minn. 140; Winona v. Whipple, 24 Minn. 61; State v. McCracken, 42 Tex. 383; Road Co. v. Reynolds, 3 Wis. 287. (5) The law to condemn land for public wharfs, piers and ferry landings is germane to the act entitled "Ferries" as much as the law to condemn land for public and private roads is germane to the act entitled "Public Roads," or the law to condemn land for drainage districts is germane to the act entitled "Ditches and Drains." The Legislature has authority to confer on county courts the power to condemn lands for ferry landings, piers and wharfs. This power has been conferred upon the county court to condemn land for road purposes and for ditch and drainage purposes by the Legislature, and the giving to the

county court such power has always been upheld by the courts of this State. R. S. 1899, secs. 9641, 9651 and 9681. (6) The act is not in violation of section 20, article 2, of the Constitution, because it fully provides for the appointment of commissioners, trial by jury and appeal to the highest courts of the land to establish what is or may be just compensation for the taking of the property for the use mentioned in the act. Therefore it is not taking property without just compensation. (7) The right of the judiciary to declare a statute void and to arrest its execution is one coupled with responsibility so grave that it is never to be exercised except in very clear cases. In these matters the courts exercise the highest and most important duty entrusted to them, and every doubt must be resolved in favor of its constitutionality, so much so that it must appear beyond a reasonable doubt to be unconstitutional. The presumption is that every act of the Legislature is constitutional until the contrary clearly and plainly appears. Edwards v. Lesueur, 132 Mo. 410; State ex rel. v. Renick, 157 Mo. 292; Phillips v. Railroad, 86 Mo. 540; Ex parte Loving, 178 Mo. 194; State ex rel. v. Railroad, 92 Mo. 137; State v. Hope, 100 Mo. 347; State v. Thompson, 144 Mo. 314; State ex rel. v. Fort, 210 Mo. 512; Deal v. Mississippi Co., 107 Mo. 464; State ex rel. v. Proctor, 193 Mo. 293.

GANTT, J.—This is an original proceeding in this court by which the relators ask a writ of prohibition to go to the respondents, the judges of the county court of St. Louis county, to prohibit them entertaining jurisdiction of a matter brought into that court on the petition of Jacob Studt, Jr., and others, asking that certain property of the relators be condemned and taken for a public wharf and ferry landing. The proceeding in the county court of which the relators complain is founded on an act of the General Assembly entitled, "An Act to amend article 1, of chapter 107, of the Revised Stat-

utes of Missouri 1899, entitled 'Ferries;' by adding six new sections thereto to be known as sections 7447 A, 7447 B, 7447 C, 7447 D, 7447 E, and 7447 F, relating to the establishment of wharfs, piers and ferry landings on the waters of this State whose banks are touched or bordered by the public highways of this State now or which may hereafter be established outside of incorporated cities, towns or villages, giving the county courts of said counties the right to condemn and appropriate land for such purposes," approved June 1, 1909. [Laws 1909, p. 511.] Relators contend that that act is unconstitutional, being in violation of section 28 of article 4 and sections 20 and 30 of article 2 of the Constitution, in certain particulars stated in their petition.

The first and second sections of the act are as follows:

"Section 1. The county courts of the several counties of this State shall have authority and are hereby empowered to establish public wharfs, piers and ferry landings for the use of the public on any of the waters of this State not entirely on the premises of one person, and outside of the limits of any incorporated town, city or village in this State, for the purpose of receiving and unloading passengers or freight on any public road of said county now or which may hereafter be established bounding or touching the banks of any of said waters, and for that purpose shall have the right to condemn such private property as may be necessary for the building of such wharfs, piers and ferry landings not exceeding one acre.

"Section 2. Upon the petition of five or more resident freeholders living in the immediate vicinity of said proposed wharf, pier or ferry landing, setting forth that they are the owners of the land in the immediate vicinity of said wharf, pier or ferry landing, and that the banks of said waters are touched or bounded by a public road of said county at the point where such

wharf, pier or ferry landing is sought to be established, and that it is necessary, in order to receive and unload freight and passengers on said public road, that a public wharf, pier or ferry landing be made at some point where the said road touches, or near the banks of said waters, fully describing the place where said wharf, pier or ferry landing is sought to be established, and the quantity of land not exceeding one acre that may be necessary for the purpose of said wharf, pier or ferry landing, and the names of the owner or owners of the land on which said wharf, pier or ferry landing is supposed to be established, the county court of the county in which said land sought to be appropriated is situated shall make an order that the said owner or owners named in said petition shall be notified that said petition has been filed and that the same will be heard by the county court of said county on a day fixed by the court, which shall not be less than fifteen days nor more than twenty days after the filing of said petition, which notice, together with a certified copy of said petition, shall be served upon the owner or owners named in said petition, of the land sought to be appropriated, at least ten days before the day fixed by said court for the hearing of said petition.''

Section 3 provides that on the day named the county court shall proceed to hear the evidence ''and if the court finds that said wharf, pier or ferry landing is necessary for public use as aforesaid,'' it shall order the county surveyor to immediately lay off the wharf, pier or ferry landing, and if he can agree with the owners as to the price to be paid for the property taken or damages for the same he is to report it to the court and if the owners will not agree he must so report, whereupon the county court will appoint three commissioners to assess the damages and when the commissioners make their award, ''the county court, or the petitioners, upon an order of the county court, shall immediately pay or tender to the owner or owners of

the land so appropriated the amount of damages so awarded to each of said landowners, and the county shall be entitled to the immediate possession of the land condemned for the purposes aforesaid."

Section 4 provides that if the owners are not satisfied with the award of the commissioners they may demand a jury to assess the damages and thereupon a jury of six men may be impaneled "to try the question of damages." And section 5 provides that either the petitioners or the landowners may appeal to the circuit court for a trial on the question of damages, but neither the application for the jury in the county court, nor the appeal to the circuit court, shall operate as a supersedeas or prevent the county court from taking immediate possession of the land. There is no appeal allowed except on the question of damages and no provision for the payment of the damages that the jury might assess. The language is: "Neither the filing of the exceptions, nor trial by jury in the county court, nor appeal to the circuit court, shall operate as a supersedeas or prevent the county court from proceeding to take immediate possession of said land and erect the wharf, pier or ferry landing as surveyed and located by the county surveyor." Where the money is to come from to pay for erecting the wharf, pier or ferry landing is not specified in the act. Section 6 gives the county court "the same control and management as they now have of the public roads of the county and by proper orders, entered of record, shall regulate the use thereof."

Section 7 provides that the notice to the owners may be served in any county in the State by an officer authorized to serve a writ of the circuit court.

Relators aver that the purpose of the act was not to serve a public necessity, or a public use, but to appropriate the property of relators to the use and benefit of the petitioners Studt and others, and certain facts are stated in relators' petition tending to sustain

that averment; those statements will be referred to herein later.

I.  Section 28, article 4, of the Constitution is: "No bill (except general appropriation bills, which may embrace the various subjects and accounts for and on account of which moneys are appropriated, and except bills passed under the third subdivision of section forty-four of this article) shall contain more than one subject, which shall be clearly expressed in its title."

There can be no doubt of the purpose of that clause in our Constitution or of its wisdom.  If the design of the promoters of this act was, as is charged, to mislead the public and the members of the General Assembly as to its object or to prevent a careful consideration of the bill before its enactment into a statute, or, whether so designed by its promoters or not, if such was its effect, it falls within the constitutional limitation above quoted.  In Cooley on Const. Lim. (7 Ed.), p. 205, it is said:  "It may therefore be assumed as settled that the purpose of these provisions was, first to prevent hodge-podge or 'log-rolling' legislation; second, to prevent surprise or fraud upon the Legislature by means of provisions in bills of which the titles gave no intimation, and which might therefore be overlooked and carelessly and unintentionally adopted; and, third, to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity of being heard thereon, by petition or otherwise, if they shall so desire."

This court has said:  "The evident object of the provision of the organic law relative to the title of an act was to have the title, like a guide-board, indicate the general contents of the bill, and contain but one general subject which might be expressed in a few or a greater number of words.  If those words only constitute one general subject; if they do not mislead as

to what the bill contains; if they are not designed as a cover to vicious and incongruous legislation, then the title can stand on its own merits, is an honest title, and does not impinge on constitutional prohibitions." [St. Louis v. Weitzel, 130 Mo. 600, 1. c. 616.]

Does the title to this act conform to that constitutional prescription?

(a) It starts out with the proclamation that it is "An Act to amend Article 1 of Chapter 107 of the Revised Statutes of Missouri, 1899, entitled 'Ferries.'" But when we turn to chapter 107 we discover that it does not relate to ferries and is not so entitled, its title is "Fish, Production and Preservation of," and article 1 of that chapter is entitled "Fish Commission." The chapter entitled "Ferries" is chapter 106 and it has no article 1; it is not divided into articles, and there is no division of the subject. It relates only to the licensing of ferries and the regulation of licensed ferries. It does not even provide for the establishment of ferries; it presupposes the establishment of the ferry by the person interested, and puts restrictions and regulations on its use.

From what we have already said as to the evil against which the Constitution in this clause aimed to guard, before we condemn an act of the General Assembly on account of a variance between the subject as it is stated in the title and the subject as it is stated in the body of the act, we ought to be satisfied that the variance is to a material extent misleading and deceptive. Although in this case there is a clear variance between the statement in the title in reference to the number of the chapter and the correct number of the chapter indicated by the title "Ferries," yet we do not think that that variance is so serious or of such a character as to justify condemnation of the act on that account alone. If only the number of the chapter had been given, without mention of its title, the variance might have been serious. but mention of the title is

more apt to bring the subject to the mind of persons interested than the mention of the number. Persons familiar with our Revised Statutes know that they are divided into chapters, each of which treats of a different subject, and besides having a number, it has also a title to indicate its subject. Thus we know that there is a chapter entitled ''Corporations,'' ''Insurance,'' ''Descents and Distributions,'' etc., all of which titles we bear in mind, and when mention is made of one of those chapters by its title we know the subject referred to, although we perhaps have paid little attention to the number and we would not ordinarily be misled or deceived as to the chapter referred to by its proper title if a wrong number were given. We do not mean to say that a misstatement of the number of a chapter in the title of an act could not under any circumstances be so misleading as to render it obnoxious to the Constitution, but what we are saying now is in reference to this act wherein the chapter proposed to be amended is referred to as chapter 107 entitled ''Ferries,'' whereas the number of the chapter entitled ''Ferries'' in the Revised Statutes of 1899 is 106.

(b) The title to the act proclaims that it is intended to amend the chapter in the Revised Statutes of 1899 entitled ''Ferries.'' Are the provisions in the body of the act germane to the subject of ferries, or, if germane to that subject in any respect are they limited to that one subject?

A chapter entitled ''Ferries'' has been in our statutes not only from the earliest days of the State but even in our territorial laws, and from the earliest date it is substantially as is the chapter under that title in the Revised Statutes of 1899. If therefore there is a chapter in our laws that ought to be as well known as any other to the people of this State it is the chapter that treats of ferries. The first section of that chapter is: ''No one shall keep a ferry, so as to demand and receive pay thereat, without a license.'' The other

sections provide how the license is to be obtained, how the ferry shall be conducted, the rates charged, etc. The whole subject is given to the county courts, evidently in their administrative as distinguished from their judicial capacity. The granting of a license, fixing the rate of ferriage, etc., are acts ministerial in character, requiring the exercise of no judicial discretion. There is nothing in that chapter that looks toward the establishing of wharfs or the building of piers for the landing of steamboats or other craft, or the exercise of the power of eminent domain in the condemning of private property for any public use. The subject of wharfs and the condemnation of land for their establishment is provided for in the Revised Statutes 1899, in the chapter entitled "Cities, Towns, and Villages," and in such cases the jurisdiction is conferred on the circuit courts, and the person whose land is taken is not deprived of his right of appeal. The idea that a public wharf and piers were a public necessity on the banks of a river, lake or creek in this State outside of a town or city is entirely new in our legislation and is introduced for the first time by this act. If this act had been entitled "An Act to authorize the county courts of the several counties in this State to establish wharfs and build piers on the banks of rivers, lakes and creeks outside of any city, town or village, for the landing of passengers and goods, and to that end empower the county courts to condemn private property to the extent of one acre and pay the damages out of the county treasury, and having so acquired the land and established the wharf and built the piers, the county court to have the control and management of the same and by proper orders entered of record regulate the use to which the same might be put," it is doubtful if such a bill would have received favorable consideration at the hands of the lawmakers, yet that is what and only what this act essays to accom-

plish under the title which purports to be an amendment only of the chapter entitled "Ferries."

In considering the question of whether or not the title was liable to mislead or deceive the members of the General Assembly it is lawful to trace the act in its passage through the Legislature. This bill was introduced in the Senate and referred to the committee on Agriculture, Roads and Highways, Bridges and Ferries (Senate Journal 1909, p. 511), and when put to the vote on its final passage it was carried unanimously. [Senate Journal 1909, p. 907.] In the House it was referred to the committee on Agriculture, and on its final passage was carried with but one vote against it. [House Journal 1909, p. 1030 and p. 1860.] The presiding officer in each house is usually guided by the title of the bill in selecting the committee to whom it is referred, and it is fair to presume that if either of those presiding officers had realized what there was in this bill he would have submitted it to the scrutiny of his judiciary committee, for it involves the constitutional rights of the citizen to be affected by the power of eminent domain. And it is also but fair to presume that if the members of the General Assembly had realized that the bill was pregnant with the power given to the county court to do what the petition in this case avers, and the return does not deny, that this county court is attempting to do, that is, to take the property of the relators worth many thousands of dollars and deny them any appeal on the constitutional question of the right to do so, the bill would scarcely have passed the General Assembly unanimously in the Senate and with but one vote against it in the House; which vote, by the way, was of a member from Jasper county, who was a lawyer. When before did a bill fraught with such power, such consequences and such questionable constitutional authority ever pass the General Assembly in silence and without opposition?

It is true this act calls not only for the establishment of wharfs and piers but ferry.landings also, and the ferry landing is supposed to be the connecting link between the act and the title ''Ferries.'' If that were conceded (but it is not), it would not relieve the act from the vice of adding wharfs and piers to the scheme at the expense of the county, or at the expense of individuals who might volunteer to furnish the money. But the second section of the act provides that the damages awarded by the commissioners shall be paid either by the county court or by the freeholders who petition to have the condemnation made; we will refer to that feature of the act *infra*.

A ferry landing is of course an essential in the operation of a ferry, but it is totally distinct from the ferry. From the beginning of the use of ferries in this State under the statutes above referred to, men have been granted licenses to operate ferries, but they have had to look to the riparian owners for the right of landing their ferries unless it was a ferry connecting the two ends of a public road, like a bridge, and thus was a part of the public highway, as in fact it usually is.

The word ferry as commonly understood conveys the idea of a means of transportation by boat across a stream or other body of water from one end of a public road to the other. In 3 Words and Phrases several definitions of the word ''Ferry'' are given, among which are: ''A ferry, in a general sense, is a highway over narrow waters, and is a continuation of the highway from one side of the water over which it passes to the other, and is for the transportation of passengers or of travelers, with their teams and vehicles, and such other property as they may carry or have with them. [New York v. Starin, 106 N. Y. 1.]

''In the case of City of New York v. Starin, 106 N. Y. 1, 11, Judge EARL says: 'A ferry is a continuation of the highway from one side of the water over which it passes to the other, and is for the transporta-

tion of passengers, or of travelers with their teams and vehicles and such other property as they may carry or have with them.' [People v. Mago, 10 N. Y. Cr. R. 453, 454, 23 N. Y. Supp. 938, 69 Hun 559.]

"As a link in the chain of transportation by dry land, a ferry forms a part of a public highway, or a connecting link between places in which the public has rights; and as such it is a thing of public interest, in which the public have the right of way or use on paying certain specified tolls, regulated and prescribed by public authorities. [Hackett v. Wilson, 12 Or. 25.]

"Legally considered, a ferry is nothing more than the continuation of a road; and, as far as regards the authority of a State, it does not differ from a toll-bridge. [Gilman v. Philadelphia, 70 U. S. (3 Wall.) 713, 726, 18 L. Ed. 96.] With regard to the authority of the State, 'a bridge' and 'a ferry' are equivalent terms. Express power to establish a ferry necessarily implies power to establish a toll-bridge.' [Oliff v. Shreveport, 52 La. Ann. 1203.]"

The idea of a ferry presupposes a road travelled by the public which is bisected by the watercourse, the ferry serving in a different way the same purpose that is served by a bridge. As the bridge is made for the road, not the road for the bridge, so is the ferry made for the road, not the road for the ferry; the ferry is the incident, the road is the principal. As a general rule a property-owner is not required to yield up his property as if for a public road, nor is a public road laid out and established at the expense of the county, to facilitate the operation of a ferry, or to enable some one to establish a ferry, but a ferry is an incident to the use of the road and presupposes the existence of the road. The ferry receives the traveler at one end of the road and lands him in the road at the other end. The idea of condemning a landing for a ferry boat which does not connect the two ends of a

public road is introduced for the first time into our statutes by this act. We do not say that a public ferry cannot exist except to connect the two ends of a public road, for all ferries that are licensed are public. But a ferry to run from a private landing on one side to a private landing on the other side is not the ferry that is usually understood by the use of that word.

A public ferry may land at a public wharf or pier and thus contribute to the use for which the wharf or pier was constructed, but wharfs and piers are not limited in their use to the landing of ferry boats, are not necessary to operation of ferry boats and are not constructed primarily for that purpose.

Neither the public in general nor the members of the Legislature would naturally understand that a bill proposing by its title to amend the statutes relating to ferries would contain in its body provisions for the condemnation of land for and the construction of wharfs and piers. If wharfs and piers exist anywhere in this State outside of cities, they are private establishments.

(c)   In the title it is said that it is an act to amend the chapter entitled "Ferries" by adding thereto six new sections relating to the establishment of wharfs, piers and ferry landings, and the condemnation of private property for that purpose. Thus, although wharfs and piers are mentioned in the title, yet they are mentioned in connection with ferry landings and as incidental to the landing of a ferry. If that is not the sense in which they are mentioned then the title calls for more than one subject in the one act.

(d)   The title is further misleading by the use of the catchword "Ferries," thereby implying that the wharfs, piers and ferry landings called for are designed to be in aid of ferries present or future, whereas it is not essential to the fulfillment of the design to establish wharfs, piers and ferry landings as manifested in this act that there should be any ferry at all.

In the case at bar there is no pretense that across this lake there is any public road the two ends of which require a ferry to connect them or that there is any ferry. But that is immaterial, if this act is valid, for a public road crossing the water is not required by the act, nor does the act require that there should be any ferry; the things called for are a wharf and a pier, the use of which shall be regulated by the county court. In order to authorize the county court to proceed to execute the power conferred, it is, according to the terms of the act, only necessary that the water should not be "entirely on the premises of one person," that it should be outside of a city or town and should now or hereafter be touched or bordered by a public road, so that passengers or freight may be landed in such public road. Wharfs and piers are more adapted to general steamboat navigation than to ferry traffic. The petitioners, the freeholders who are given the right to apply to the county court to put this power into execution, are not required to make a showing of any other fact than that they reside in the vicinity of the proposed wharf, that they own land in that vicinity, that the water is outside of any city, is not entirely on the premises of one person, that it is touched or bounded (n. b. not crossed) by a public road and that the establishment of such "wharf, pier or ferry landing is necessary in order to receive and unload freight and passengers on such public road." And the facts of the case now at bar show that neither the movers in that matter nor the county court considered it at all necessary that there should in fact be a ferry, for the petitioners make no such averment in their petition and make no such claim in their brief and the county court finds no such fact. We assume that there is no public ferry across the lake in question, that none is contemplated, and that the acre of land of relators sought to be condemned is not intended as a ferry landing, certainly not a ferry landing as that term is usually understood to mean. We do not

mean to imply that, if there was in fact at present or in contemplation a public ferry across this lake, the constitutional objections to the act would be removed, but we refer to the fact that the wharfs and piers called for are not required by the terms of this act to be in aid of ferries.

The bill in section 6 gives the county court the power by orders entered of record to regulate the use of the wharf and pier. Let us interpret the meaning of that section in the light of the facts of this case. It is averred in relators' petition, and not denied by respondents, that: ''The land sought to be condemned for an alleged public use in said proceedings by the said Jacob Studt, Jr., et als., lies along and is adjacent to the waters of a body of water known as Creve Coeur Lake in St. Louis county, Missouri, which lake is about three miles long and about one mile wide, its mean depth being only a few feet, so that said lake is not adaptable nor suitable for purposes of commercial navigation, but is used now and has ever been used exclusively by pleasure-seekers for recreation, sport and enjoyment; that said lake is located only a short distance from the city of St. Louis, which city contains many thousands of inhabitants, and said lake is easy of access to persons living in said city; that during the summer months of each year for many years past, many thousands from said city and its vicinity have visited said lake for pleasure, sport and recreation, and the relators, the United Railways Company of St. Louis, as owner and lessor, and the Bluff Scenic Railway Company, as lessee in possession, have expended and invested over two hundred thousand dollars in beautifying and improving the large tract of land owned as aforesaid by the said United Railways Company of St. Louis, along the shore and adjacent to waters of said lake; that said relators own and operate, principally during summer months, a pleasure resort at said lake upon said land, and to maintain which the

relators have constructed many buildings and devices
at great expense, such as a scenic railway, a restaurant,
observation tower and baseball grounds, to be used and
which will be used by persons going to said resort for
pleasure, and among other things the relators, at great
expense, have had constructed and now maintain a
wharf or pier built from said land into the waters of
said lake, and for many years past and now the rela-
tors use said wharf or pier as a depot where they rent
for profit boats kept there for that purpose, to pleas-
ure-seekers and visitors who come to said resort; that
the business of renting boats as aforesaid is very lucra-
tive and profitable, especially during the summer
months, and several thousands of dollars are annually
obtained by the relators as a revenue therefrom; that
the land sought to be condemned in said proceedings,
in said county court before the respondents, is a part
of the land above described, upon which the pleasure
resort of relators is located, and said particular piece
of land so sought to be taken from the relators for al-
leged public use as a wharf, pier or ferry landing, in-
cludes and comprehends the exact location of the wharf
and dock of relators; that if said land be taken from
relators as sought to be done by the said Jacob Studt,
Jr., et al., in said proceedings, it will entail damage to
relators in the sum of many thousands of dollars; that
there is no public necessity for the condemnation of
said land, but said proceedings in said county court
are being pressed by rival owners of other pleasure
resorts on said lake, of whom said Jacob Studt, Jr.,
is one, who are endeavoring through special and par-
tial legislation for motives of competitive zeal to de-
stroy the business of the relators by having thrown open
to the public generally, by the action of the county
court of St. Louis county, the private premises of the
relators, and to enable themselves, the petitioners in
said proceedings, and their patrons, to enjoy the use of
the property of the relators without their consent,

against their will and to their great damage and injury.''

If this act was designed to accomplish the purpose there .expressed it could not have been more skillfully drawn, and if the act is valid it allows the county court to appropriate the property of relators to the use and benefit of their rivals in business.

II.  Section 20 of article 2 of the Constitution forbids the taking of private property for private use, and declares that the question whether a proposed taking is for a public use is a judicial one, regardless of what the Legislature may have said on the subject.

Ordinarily when a statute provides for the taking of private property for a public use it provides also for the payment of the damages out of the public treasury, or by special taxbills in a district especially benefited, except when the party moving is a public utility corporation, in which case the law requires it to furnish the money.  Possibly also an exception may be found in the statute regarding the opening of a public road when the county court does not deem the proposed new road of sufficient public necessity to justify paying the damages out of the county treasury, but allows the road to be opened if the petitioners deposit in court the estimated amount of damages to be paid to the land-owner.  But even in such case it has been held that if private property be allowed by the county ·court to be taken under the guise of a pretended public use, when in fact it is only for the convenience of private persons who are willing to pay for it, ''such an act would be an abuse of power and would violate a constitutional property right.''  [Seafield v. Bohne, 169 Mo. 537, 1. c. 551.]  But in the act now under discussion we have a novel feature in reference to the payment of damages.  It provides that any five freeholders who own land in the immediate vicinity may put the machinery of the law into motion by filing a petition in the county

court and then, when the commissioners make their award, the act says "the county court, or the petitioners, upon an order of the county court, shall immediately pay or tender to the owner or owners of the land so appropriated the amount of damages so awarded to each of said landowners. and the county shall be entitled to the immediate possession of the land condemned for the purposes aforesaid."

There is no authority given the county court to pay such damages, or appropriate money to build wharfs and piers, out of the county treasury, and that fact itself shows the impotence of the act, and points with significance to the uncontradicted statement in the relators' petition that the proceeding was in fact an effort to take private property for the private use of the movers in the matter. The only provision that is made in the act looking to the payment of damages is in reference to the damages awarded by the commissioners in the first instance selected by the county court, and even that imposes no binding obligation on the county and only a questionable obligation on the movers; the only inducement to pay is that payment into court must be made before the county can take possession. There is nothing in the act imposing on the freeholders who petition the county court to move in the matter a liability for the damages sustained by the parties whose land is to be taken or damaged. Whenever was there a statute providing for the taking and damaging of private property for a bona fide public use and no provision made for the payment of the damages suffered except from the voluntary contributions of private citizens? The county court is here in the attitude of conducting in its own forum a proceeding that is to give it possession and control of very valuable property and is choosing its own commissioners to assess the damages to be sustained by the persons whose property is to be taken. When those commissioners report, if the movers in the matter see

fit to do so they may pay into court for the parties injured the amount of the award, no matter how inadequate it may be; then the county court may take possession of the property, and the only question that relators can litigate on appeal is the question of damages. If at the end of the litigation, whether it be for months or for years, the damages awarded the relators should be more than the movers are willing to pay, there is nothing in the act authorizing the circuit court to enter judgment against them for the amount and issue execution, nor is there any provision for the amount to be paid out of the county treasury. If at the end of the litigation the damages assessed by the jury should be more than the movers see fit to pay, doubtless some means could be found to enable relators to regain possession of their property, although the act is silent on that subject and the relief would have to be found outside of it. But who will pay for the damages suffered by relators in the meantime? They say in their petition, and it is not denied, that they obtain a revenue of several thousands of dollars annually from this property. If it be withheld from them even during one summer they would suffer great damage in the loss of their revenue, to say nothing of the expenses of the litigation to regain possession, and a disorganization of their business. There is no provision in the act to compensate them for that loss.

It does not appear from the record in this case that the movers in the county court conducted a public ferry or were interested in a public ferry, nor does the act require that they should be, nor does it appear that there was a public ferry there, nor does the act require that there should be, but it does appear from the record that the movers are competitors of relators in their business of furnishing refreshments, pleasure boats and amusements to the public for gain, and that private interest is the only motive that appears in this record. The relators may be mistaken in their conclu-

sion that the bill which resulted in the passage of this act was drawn and introduced in the General Assembly for the sole purpose of enabling the movers in this case to get possession of relators' property for their own private use, but even if the relators are mistaken in that conclusion, the act, whether so designed or not, would, if given effect in this case, accomplish that purpose, and therefore it is obnoxious to section 20 of article 2 of our Constitution which forbids the taking of private property for private use.

The chapter entitled "Ferries" has passed through all the revisions from the earliest period with that simple title, but the committee of the last General Assembly having in charge the revision of 1909, seemingly appreciated the fact that that title would no longer indicate the whole contents of the chapter and they have added to the title so that the chapter is now entitled "Ferries, Ferry Landings and Wharfs." And they have divided it into two articles, article 1 relating to "Ferries," and article 2 to "Ferry Landings and Wharfs, How Condemned or Leased." The committee were right in so doing, for the chapter, with this act added, contains two subjects.

This act is fraught with so much danger to the rights of the citizen to his private property that its passage through the General Assembly by practically a unanimous vote can be accounted for only on the theory that the members were misled by the title and were not informed as to its contents.

Other constitutional objections to the act are urged by relators, but enough has been said.

We hold the act (Laws 1909, p. 511) entitled "An act to amend article I, of chapter 107, of the Revised Statutes of Missouri, 1899, entitled, 'Ferries,' by adding six new sections thereto to be known as sections 7447a, 7447b, 7447c, 7447d, 7447e, and 7447f, relating to the establishment of wharfs, piers and ferry landings of the waters of this State whose banks are

touched or bordered by the public highways of this State now or which may hereafter be established outside of incorporated cities, towns or villages, giving the county courts of said counties the right to condemn and appropriate land for such purposes,'' approved June 1, 1909, to be unconstitutional and void.

The writ of prohibition is awarded. *Valliant, Lamm, Woodson* and *Graves, JJ.,* concur; *Burgess, C. J.,* absent; *Kennish, J.,* dissents.