STATE OF MISSOURI at the Relation of the CAIRO BRIDGE COMMISSION, a Body Corporate and Politic, Relator, v. JESSE MITCHELL, CLARENCE EVANS and JOHN T. WADDILL, as Members of the State Tax Commission of Missouri; FORREST C. DONNELL, DWIGHT H. BROWN, ROY McKITTRICK, FORREST SMITH and WILSON BELL, as Members of the State Board of Equalization of the State of Missouri.—No. 38892.—181 S. W. (2d) 496.

Court en Banc, June 5, 1944.

Rehearing Denied, July 3, 1944.

*Carter, Bull & Garstang* and *Dewey & Cummins* for relator; *Emmet T. Carter, W. E. Cummins* and *David A. McMullan* of counsel.

1138

*Roy McKittrick,* Attorney General, and *Robert J. Flanagan,* Assistant Attorney General; *Tyre W. Burton* of counsel.

 ELLISON, J.—This is an original proceeding in certiorari on relation of the Cairo Bridge Commission, a Federal non-profit corporation, to review the records of the State Tax Commission and the State Board of Equalization pertaining to orders made by them on September 20, 1943, assessing the property of the relator in Mississippi county for state taxation at a valuation of $400,000. The property thus assessed was the west half of a bridge across the Mississippi River, owned by the relator. The facts are undisputed. The sole issue is one of law—whether said orders were illegal and in excess of the jurisdiction of the Tax Commission and the Board of Equalization.

The relator contends the bridge is an agency or instrumentality of the United States and exempt from State taxation on two theories: (1) immunity *implied* from its nature and purposes; (2) because of the *express* provisions of the Act of Congress under which it was purchased by relator. The respondent members of said State taxing agencies assert the doctrine of implied tax immunity will not protect the relator in this instance because the bridge is not owned, controlled or operated by the United States, nor is it an instrumentality essential to the exercise of the functions of Federal government. With respect to relator's claim of express immunity, respondents deny the Act of Congress under which the bridge was purchased does exempt the bridge from state taxation. This raises a question of statutory construction which involves certain references made by that Act to a prior Act of Congress creating the relator Cairo Bridge Commission. It is the only question we shall discuss, since we think it is decisive of the case.

By an Act of Congress approved April 13, 1934 (48 Stat. 577) the relator Cairo Bridge Commission was created as a body corporate and politic with perpetual succession but with no capital stock or shares of interest or participation; "*and all revenues and receipts thereof shall be applied to the purpose specified in this Act.*"[1] It was authorized to construct, maintain and operate a bridge and approaches across the Ohio River at or near the City of Cairo, Illinois; and to purchase, maintain and operate ferries across the Ohio and/or Mississippi Rivers within ten miles of the location selected for the bridge.

---

[1] Italics in quotations are ours unless otherwise noted.

1140

Sec. 4 of the Act authorized the Bridge Commission to provide for the payment of the cost of the bridge, appurtenances and ferries by issuing, repurchasing, paying and retiring negotiable bonds maturing in not exceeding 40 years and bearing not exceeding 6% interest per annum. The outlay for these purposes was to be "payable *solely* from the sinking fund provided in accordance with this Act." The sinking fund was to be created from bridge tolls. And the same Sec. 4 of the Act further provided: "The bridge constructed under the authority of this Act shall be deemed to be an instrumentality for interstate commerce, the Postal Service, and military and other purposes authorized by the Government of the United States, and *said bridge* and ferry or ferries and the *bonds* issued in connection therewith *and the income derived therefrom* shall be *exempt from all Federal, State, municipal, and local taxation.*"

Sec. 5 of the Act provided: "in fixing the rates of toll to be charged for the use of such bridge the same shall be *so adjusted* as to provide a fund sufficient to pay for the reasonable cost of *maintaining, repairing, and operating the bridge* and its approaches under economical management, and to provide a sinking fund sufficient to pay the *principal and interest* of such bonds as the same shall fall due and the *redemption or repurchase price* of all or any thereof. . . . *All tolls and other revenues* from said bridge are hereby pledged *to such uses* and to the *application* thereof as hereinafter in this section required. After payment or provision for payment therefrom of all such cost of maintaining, repairing, and operating and the reservation of an amount of money estimated to be sufficient for the same purpose during an ensuing period of not more than six months, the *remainder* of tolls collected shall be placed in the sinking fund, at intervals to be determined by the Commission prior to the issuance of the bonds."

Subsequent sections of the Act provided that after payment of the bonds and interest, or after a sinking fund sufficient for that purpose should have been provided and held, the Bridge Commission should deliver deeds of conveyance of the interest of the Commission in the bridge, that part within Illinois to the State of Illinois, or any municipality or agency thereof, as might be authorized by law to accept the same; and the other part similarly to the State of Kentucky, under the condition that the bridge should thereafter be free of tolls and properly maintained, operated and repaired by the grantee States. But if either State should not accept the grant on those conditions, then the Bridge Commission should continue to maintain and operate the bridge, with the rate of tolls so adjusted as to provide a fund not exceeding ▮▮▮ the amount necessary for maintenance, repair and operation. And finally Section 10 of the Act provided "nothing herein contained shall be construed to authorize or *permit* the (Bridge) Commission or any member thereof

to create any obligation or *incur* any liability other than such obligations and liabilities as are dischargeable solely from funds provided by this Act.''

The above is a sufficient statement of the provisions of the Act of Congress of April 13, 1934. It is plain that the intention was to construct a bridge across the Ohio River at Cairo and to buy and operate adjacent ferries, all at least partially for the purpose of facilitating interstate commerce and the functioning of the Postal Service and the military arm of the Federal government. The project was to be self-supporting, through the issuance of bonds which were to be retired from bridge tolls. The bridge, bonds and tolls were to be tax exempt. And when the bridge was paid for, it was to be conveyed to the two abutting States gratis, if they would accept it on condition that it would be maintained and operated toll free; if not, then the Bridge Commission would continue in charge at cost, through the collection of bridge tolls.

A little over four years later the Act of June 14, 1938 (52 Stat. 679) was passed. It authorized the relator Bridge Commission to purchase through the issuance of bonds the existing bridge over the Mississippi River here involved, which had been constructed by a private corporation under a previous Act of Congress containing no specific tax exemption clause. The east end of that bridge was within 735 feet of the north end of the Ohio River Bridge, and they were served by the same approach. In other words the Mississippi River bridge was well within the area for ferries which the Bridge Commission had been authorized by the 1934 Act to purchase, maintain and operate. This 1938 Act was patterned after the 1934 Act and had the same purposes. Many of the Sections were almost identical, including parts quoted and italicized above requiring the bonds to be paid solely out of a sinking fund raised from bridge tolls, and restricting and pledging the tolls to that purpose and to maintenance, repairs and operation. But with reference to the bonds to be issued and the bridge tolls to be collected, Sec. 5 of the 1938 Act said:

''*All* of the provisions of sections 4 and 5 of said Act of April 13, 1934, *relating to the bridge* to be constructed, to the bonds to be issued and to the trust agreement to be entered into under the authority of said Act, *and relating to the collection of bridge tolls* and to the *application of such tolls,* shall apply to the bridge to be acquired and to the bonds to be issued under the authority of this Act.''

So much for the facts. It is not contended that Congress lacked the power to provide the Mississippi River bridge here involved should be tax exempt. Respondents simply assert that on a proper construction the *reference* in Sec. 5 of the 1938 Act back to Sec's 4 and 5 of the 1934 Act, did not make the bridge tax exempt; although they concede those two sections of the 1934 Act did exempt the Ohio River bridge from taxation. Indeed, the Tax Commission in its

order below *found* that (quoting substantially): "Section 5 of the 1938 Act does not *incorporate* the tax exemption feature of Sec. 4 of the 1934 Act; and the Mississippi River bridge is not *brought within* the tax exemption provisions of the 1934 Act." Two reasons are urged for this view.

The first is that the reference in Sec. 5 of the 1938 Act to Sec's 4 and 5 of the 1934 Act is *general,* and that such general references by an adopting statute to an adopted statute do not carry over into the former the specific provisions of the latter, but only its general provisions. The second reason is that the exact question was determined adversely to relator in Miller v. City of Greenville (8th Ct.), 138 Fed. (2d) 712, 717, the decision further showing that when the President of the United States approved the 1938 Act he did not think it would exempt the Mississippi River bridge from taxation. On the first point—that a general reference in one statute to another will not import specific provisions of the latter—respondent stresses State v. Lloyd, 320 Mo. 236, 244(II), 7 S. W. (2d) 344, 346(2), quoting 36 Cyc., p. 1152, now 59 C. J. sec. 624, p. 1059, note 21. Relator also cites the same case. The matter quoted in the Lloyd case is as follows:

"A statute may adopt a part or all of another statute by a specific and descriptive reference thereto, and the effect is the same as if the statute or part thereof adopted had been written into the adopting statute. Where, however, the adopted statute is referred to merely by words describing ▇▇▇ its general character, only those parts of it which are of a general nature,[21] or particularly relate to the subject of the adopting statute, will be considered as incorporated into the latter; . . . "

Relator relies on the first sentence of the quotation, and respondents on the second. The only marginal citation to note 21 in the latter is Rex v. Surrey, 2 T. R. 504, 100 Reprint 271, 274, decided in 1788. It was a criminal prosecution for violating an English excise statute by printing cotton cloth before it had been marked and measured by the proper officers. After conviction the defendant was denied an appeal and brought mandamus thereto, invoking a section of the excise statute which by general reference "incorporated all the remedies given by any Excise laws." There were a great number of these statute laws, some allowing an appeal and some not. It was held the variation on that point in the several statutes indicated a legislative intent that the right of appeal should be withheld unless expressly granted; and that the reference in the particular statute extended only to "all the general powers and provisions given and made in Acts pari materia."

The Lloyd case, supra, and another like it, State v. Settle, 329 Mo. 782, 790, 46 S. W. (2d) 882, 884 also were criminal prosecutions— against bank officers under Sec. 4510, R. S. 1939, Mo. R. S. A., sec.

4510, for making excessive bank loans. The statute referred by number to another statute, now Sec. 7952, as fixing the limits of such loans. That statute was in the civil code, governing banks, and contained many numbered paragraphs, subparagraphs and exceptions. Paragraph 1 covered loans to the public generally; and paragraph 8, loans to salaried bank officers with the *recorded consent* of the board of directors. Both of the above decisions held the informations therein were bad; but not on the ground that the general reference in Sec. 4510 to Sec. 7952 was insufficient. On the contrary, both cases agreed the reference did merge the two statutes as far as they would blend; and that paragraph 1 of Sec. 7952 was applicable to Sec. 4510, though paragraph 8 was not because it introduced an additional element—recorded consent of the board of directors—which was wholly foreign to Sec. 4510.

We think all three of the above decisions, the English case and the two Missouri cases, are authority against respondents instead of for them. All are criminal cases, where the rule for construing indictments and statutes is stricter in favor of the accused than it is in civil cases involving the construction of a statute. And yet all of them held a general reference by one statute to another will adopt the related and congruous portions of the latter. The English case said a broad general reference in one excise statute to all remedies in any and all other excise statutes would adopt all the general provisions in all of them that were in pari materia, but not special provisions peculiar to the several statutes. Statutes are in "pari materia" when they are upon the same matter or subject. 31 C. J., p. 358; and the rule of construction in such instances proceeds upon the supposition that the several statutes relating to one subject were governed by one spirit and policy and were intended to be consistent and harmonious in their several parts and provisions. Dupont v. Mills, 39 Del. 42, 62, 196 Atl. 168, 119 A. L. R. 174, 185.

The rule of construction just stated undoubtedly ought to be followed here, to carry out the intention of Congress, unless the legislation comes within the exception applying to statutes granting tax exemptions. The general doctrine is that tax exemption statutes should be strictly construed because taxes are imposed on the whole citizenry for the support of the government, and exemptions are discriminatory. 61 C. J., sec. 396, p. 392. "Taxation is the rule, exemption is the exception." Y. W. C. A. v. Baumann, 344 Mo. 898, 902(1), 130 S. W. (2d) 499, 501(1). But as to property owned by the State or any of its political subdivisions, the doctrine is reversed. There taxation is the exception and not the rule. This State in its Constitution expressly exempts its own property as well as that of counties and "other municipal corporations;" and also certain land or property used for other specified public purposes, Sec. 6, Art. X. There is no presumption that the State intends to tax itself. State

ex rel. Caldwell v. Little River Drainage District, 291 Mo. ▇▇ 72, 80, 236 S. W. 15, 16.[2] The State and Federal governments stand on an equality with reference to the right of immunity of their respective instrumentalities. 61 C. J., sec. 369, p. 371. And Congress may protect its agencies from the burdens of local taxation. Mayo v. United States, 319 U. S. 441, 446, 87 L. Ed. 1504, 63 S. Ct. 1137, 147 A. L. R. 761, 764.

It is admitted here that the 1934 Act of Congress created the relator Bridge Commission as a Federal instrumentality; and that it did expressly exempt the Ohio River bridge from all taxation. The 1938 Act provided the Mississippi River bridge, only 735 feet away, should be purchased and brought under the same ownership by the same methods and for the same purposes. The two statutes were almost exactly alike except that the later one adopted part of the earlier by reference. The only question is whether that reference adopted, or included, the tax exemption clause. In deciding it we hold neither statute should be subject to a strained construction.

It is a further general rule that statutes are to be construed, if possible, so as to harmonize and give effect to all their provisions. State ex rel. Mills v. Allen, 344 Mo. 743, 751(13), 128 S. W. (2d) 1040, 1043(4). This necessarily requires that in determining the meaning of particular sections of a legislative Act all other parts thereof should be consulted so far as they throw light thereon. Therefore in the instant case, where Sec. 5 of the 1938 Act refers to Sec's 4 and 5 of the 1934 Act, we may and should consider the other parts of the 1938 Act in construing Sec. 5 thereof; and the other parts of the 1934 Act in construing Sec's 4 and 5 thereof.

Considering the 1934 Act first. Sec. 4 thereof, as heretofore quoted, provided that: (1) "said bridge", meaning the Ohio River bridge; (2) and "the bonds issued in connection therewith"; (3) and "the income derived therefrom"; all should be exempt from Federal, State, municipal taxation. And this express provision that the bridge should be tax free was fortified by other provisions. The only income of the Bridge Commission was from the bridge tolls. And these were pledged by Sec. 5 to specific purposes; payment of the principal and interest on the bonds; and maintenance, repairs and operation. Sec. 9 provided all revenues and receipts of the Commission "shall be applied to the purposes specified in this Act." And Sec. 10 said that nothing contained in the Act should be construed to authorize or permit the Bridge Commission to incur any liability other than those made dischargeable solely from funds provided by the Act. In other words,

[2]On that theory rural statutory drainage districts were held tax exempt as "municipal corporations" in this Caldwell case, and the St. Louis Housing Authority was similarly exempted in Laret Inv. Co. v. Dickmann, 345 Mo. 450, 134 S. W. (2d) 65; though neither was exempted by the Act under which it was created.

no taxes on the bridge could have been paid because no money was made available for that purpose—at least that is true when all these provisions are considered together.

Now turning to Sec. 5 of the 1938 Act, heretofore quoted. It declares *all* provisions of said Sections 4 and 5 of the 1934 Act relating: (1) "to the bridge to be constructed", meaning the Ohio River bridge; (2) and to bonds; (3) and to the collection and application of bridge tolls; shall apply to the Mississippi River bridge to be purchased. • And certainly the provision in Sec. 4 of the 1934 Act that the Ohio River bridge should be tax exempt was a provision relating "to the bridge to be constructed." Furthermore, said provision in Sec. 5 of the 1938 Act adopting the provisions in Sec. 5 of the 1934 Act relating to the collection and application of bridge tolls, took them over (in the absence of anything appearing to the contrary) with the meaning they had in the latter Act, which, as stated in the last paragraph, precluded the payment of bridge taxes out of bridge tolls. In addition to that, Sec's 3 and 4 of the 1938 Act repeated part of those restrictions. If the 1938 Act did not mean that the Mississippi River bridge was to be tax exempt, it was discriminatory, since the Ohio River bridge admittedly was exempt, the two bridges were almost end to end, and they were held in a common Federal ownership for the same public purposes under parallel statutes.

We are constrained to the view that the foregoing provisions did make the Mississippi River bridge tax exempt. Respondents say that conclusion is directly contrary to the ruling in Miller v. City of Greenville, Miss. (8th Ct.), 138 Fed. (2d) 712, 717; but we think not. That case, a declaratory judgment suit, was not ruled on the merits. It held no issues were presented upon which Federal jurisdiction could be appropriately exercised; and reversed and remanded the cause with directions to the Federal District Court to dismiss the suit without expressing any opinion on the merits. Nevertheless the Circuit Court of Appeals did express some conclusions averse to a claimed tax exemption, in stating *why* Federal jurisdiction should not be exercised. So we consider it. That suit was a bridge tax exemption case; the bridge was built across the Mississippi River under an Act of Congress (52 Stat. 681) dated June 14, 1938, the same date as that of the 1938 Act here involved; and the Act did provide that the bridge tolls should be so adjusted as to cover the construction; maintenance, repair and operating costs of the bridge, and that after it had been paid for it should be maintained and operated toll free. But otherwise the facts were entirely different.

The Federal government did not finance, build, own and operate the Greenville bridge though an agency such as the relator Bridge Commission. The Act providing therefor was a short, one page statute, which merely *authorized* the City of Greenville to construct it and *conferred* the power of eminent domain for the particular project

as possessed by railroad and bridge corporations. It did not say the bridge should be a Federal instrumentality. The City owned the bridge and obtained money from the Reconstruction Finance Corporation under the Industrial Recovery Act, 40 U. S. C. A., sec. 401, p. 351, et seq., through the issuance of bonds secured by a deed of trust on the bridge tolls. And Congress *made no reference whatever* in the Greenville Act to exempting the bridge from taxation. All these facts are set out in the opinion in the Greenville case, this last one being stressed. And it may well be that in the absence of a tax exemption provision the other requirement in the Greenville Act, that the bridge tolls should be adjusted to pay the cost of construction, maintenance, repairs and operation, would not preclude the payment of taxes since they are often classed as operating costs. 29 Words & Phrases (Perm. Ed.), ''Operating Expenses,'' p. 558. But in the instant case there was such a provision by reference.

The part of the Greenville opinion emphasized by respondents is the recital therein that on June 25, 1938, eleven days after the President of the United States had approved the Greenville Act, he vetoed another Act providing for a bridge across the Mississippi River at Dubuque, Iowa, and containing a tax exemption clause which almost copied the clause appearing in Sec. 4 of the 1934 Act here involved. The President gave as his reason that he was opposed to the classification of publicly owned interstate bridges as Federal instrumentalities, and to their exemption from State and local taxation. The Dubuque Act then was repassed and approved with those features omitted. The Greenville case held this proved it was the intention of Congress that when such a clause is omitted the bridge will be subject to taxation.

Respondents pick up that reasoning and point out that the instant 1938 Act authorizing the purchase of the Mississippi River bridge at Cairo, also was *approved* on June 14, only eleven days before the President *vetoed* the first Dubuque Act. Thence they argue he must have had the same adverse views in mind when he approved the 1938 Cairo Act; and from that they conclude he thought the reference in Sec. 5 of said 1938 Cairo Act to Sec. 4 of the 1934 Cairo-Ohio River bridge Act did not adopt the tax exemption clause therein; for otherwise he would have vetoed the 1938 Cairo Act also. We cannot say. The President may have felt that since one of these two Government owned and closely adjacent bridges stemming out of Cairo was tax exempt, the other ought to be likewise; or the point may have been overlooked by his advisers.

But however that may be, we must follow the law announced in many decisions. It has been held the grant to one corporation of ''all the rights, powers and privileges'' of another, will not transfer a tax exemption enjoyed by the latter, because the words are too indefinite. 61 C. J., sec. 397, p. 397. But Washington University v.

Baumann, supra, 341 Mo., l. c. 723(3), 108 S. W. (2d) l. c. 411 (5), decided the word "immunities" was sufficient in that case. Here, Sec. 4 of the 1934 Act concededly made the Ohio River bridge tax exempt; and Sec. 5 of the 1938 Act expressly applied that provision to the Mississippi River bridge. Another case, State ex rel. School Dist. v. Lee, 334 Mo. 513, 516(1), 66 S. W. (2d) 521, 523(1) quotes 27 R. C. L., sec. 160, p. 907, which says the provisions of one statute are frequently adopted by another through reference to avoid incumbering the statute books. See also 50 Am. Jur. secs. 36-38, pp. 57-8. We think it was done effectively in this case.

 For the reasons stated the records of the State Tax Commission and the State Board of Equalization, of September 20, 1943, relative to the bridge involved, are quashed. All concur.