STATE of Missouri ex rel. Frank H.
WAGNER, Relator,

v.

ST. LOUIS COUNTY PORT
AUTHORITY, Respondent.

No. 62024.

Supreme Court of Missouri,
En Banc.

Sept. 9, 1980.

Edwin J. Kohner, J. Anthony Dill, St. Louis, for relator.

Thomas C. Walsh, Michael G. Biggers, Thomas K. O'Shaughnessy, St. Louis, for respondent.

Milton F. Svetanics, St. Louis, for amicus.

MORGAN, Judge.

This action in the nature of quo warranto is brought at the relation of a St. Louis County resident, taxpayer and owner of real property near an area proposed for development by respondent Port Authority.

Relator challenges the constitutionality of the Missouri Port Authority Law, contained in Chapter 68, RSMo 1978 as amended by 1979 Mo. Laws, H.B. 102 sec. 1, at 269 (hereinafter the Act), and also questions the legality of various activities of respondent which have been taken or are planned pursuant to the Act. Enacted initially in 1974, the Act represents specific statutory authority presumably in aid of the purposes of a port authority as set out in § 68.020. Among the powers given to an authority created pursuant to the Act are to approve the construction of all wharves, piers, bulkheads, jetties or other structures; to prevent or remove or cause to be removed obstructions in harbor areas; to recommend the relocation, change or removal of dock lines and shore or harbor lines; to acquire, own, construct, lease and maintain recreational facilities, industrial parks, industrial facilities and terminals, terminal facilities, warehouses and any other type port facility; to acquire, own, lease, sell or otherwise dispose of interest in and to real property and improvements situated thereon and in personal property necessary to fulfill the purposes of the port authority; to acquire rights–of–way within the district by purchase, negotiation or condemnation; to accept gifts, grants, loans or contributions; and to operate a recreational facility, industrial parks and terminals and terminal facilities, warehouses and any other type port facility for a limited period when private operators are not interested or available to do so. See § 68.025(1), 1979 Mo. Laws.

An authority also is empowered under § 68.040(1) to issue negotiable revenue bonds or notes "in such principal amounts as, in its opinion, shall be necessary to provide sufficient funds for achieving its purposes, including the construction of port facilities; establish reserves to secure such bonds or notes; and make other expenditures, incident and necessary to carry out its purposes and powers." The powers and procedures to be followed by an authority in this regard are those "now and hereafter conferred upon or applicable to the environmental improvement authority, Chapter 260, RSMo, relating to the manner or issuance of revenue bonds and notes . . ." § 68.040(6). The same section exempts an authority from taxation on the notes and bonds and the income therefrom from any taxes or assessments of the state or from any political subdivision thereof. § 68.-040(5).

Pursuant to the earlier version of the Act, respondent St. Louis County Port Authority was created in 1977 by county ordinance. In 1978 the Authority was approved by the Transportation Commission of the state, which also later approved the boundaries of the port district as defined by the St. Louis County Council.

The Authority now has embarked on what is called the "South Mississippi Project," involving three successive phases. The plan, approved January 16, 1980, calls for the development in the southern part of St. Louis County. According to the stipulation of facts entered into by the parties in this proceeding, Phase I is to consume twenty–five acres of land in an unincorporated area adjacent to the Mississippi River and "provides for the purchase and construction of certain improvements, fixtures, equipment and other related support facilities . . . for use as terminal, warehouse and other port facilities serving the general public."[1] The cost of this phase is estimated at $6.39 million. Phase II is to encompass thirty–three more acres, also in an unincorporated area of the county adjacent to and immediately west of the acreage in Phase I. This second stage calls for the construction of $18.2 million of improvements for use as an industrial park serving the general public. The land to be used in Phases I and II is owned by Bussen Realty Company, a private concern headquartered in the county. Phase III is the development of a truck terminal at the intersection of Interstate Highway 270 and Koch Road, about one–half mile north of the other proposed developments. Total cost for this stage is estimated at $800,000.

The Bussen company's application for the development of Phases I and II has been approved by the Authority. Included in that approval is authorization for the Authority to issue and sell revenue bonds to finance the first two phases of the project; to enter into contracts for the purchase or construction of facilities proposed therein, to enter into mortgages and indentures of trust on the improvements in favor of the holders of the revenue bonds and to execute leases of both developments to Bussen consistent with its operation serving the general public. The Authority also has adopted a resolution authorizing issuance of revenue bonds for Phase III, subject to approval of a final plan therefor, and the execution of a mortgage, indenture of trust and lease or sale arrangement.

### Challenges to the Act

Relator submits fourteen points and numerous subpoints, with some overlapping, in support of this original proceeding. For purposes of clarity, most points will be set forth in outline form, and will be considered separately where thought necessary.

I. *The provision in the Act authorizing the issuance of revenue bonds permits their use in aid of private corporations, and such a use renders the provision invalid as violative of the principle that public funds may be expended only for public purposes.*[2]

■ This claim is without merit because the Act serves a proper public purpose, and any aid provided to private corporations is merely incidental to such purpose. In making this determination, we again examine the expressed purposes of a port authority as expressed by the General Assembly in § 68.020:

It shall be the purposes of every port authority to promote the general welfare, to encourage private capital investment by fostering the creation of industrial facilities and industrial parks within the port district and to endeavor to increase the volume of commerce, and to promote the establishment of a foreign trade zone within the port districts.

■ A review of these purposes is limited by the long–standing rule that determination of what constitutes a public purpose is primarily for the legislative department and will not be overturned unless found to be arbitrary and unreasonable. In this re-

---

1. Specifically the improvements include a bulk materials loader, two warehouses, two heavy manufacturing plants, an overhead conveyor, two petroleum tanks and waterside improvements.

2. Relator does not cite the constitutional bases for this claim, yet relies on cases whose holdings were in response to constitutional attacks. We only can assume that relator would refer us to Mo.Const. art. VI, §§ 23 and 25 as did the relator in *State ex rel. Jardon v. Industrial Development Authority of Jasper County*, 570 S.W.2d 666 (Mo. banc 1978), in making a similar attack.

gard the burden of so showing, as is usual in constitutional challenges to legislation, is on the party making the claim. For an expenditure to have a public purpose it must be:

. . . for the support of the government or for some of the recognized objects of government, or directly to promote the welfare of the community. It may also be conceded that that is a public purpose from the attainment of which will flow some benefit or convenience to the public. In this latter case, however, the benefit or convenience must be direct and immediate from the purpose, and not collateral, remote or consequential.

This test was quoted with approval in *Dysart v. City of St. Louis*, 321 Mo. 514, 11 S.W.2d 1045 (banc 1928), and has been reiterated through the years. *See, e. g., Menorah Medical Center v. Health and Educational Facilities Authority*, 584 S.W.2d 73 (Mo. banc 1979); *State ex rel. Jardon v. Industrial Development Authority of Jasper County*, 570 S.W.2d 666 (Mo banc 1978); and *State ex rel. Mitchell v. City of Sikeston*, 555 S.W.2d 281 (Mo. banc 1977).

In connection with this test it also has been said that if the primary purpose of a statute is public "the fact that special benefits may accrue to some private persons does not deprive the government action of its public character, such benefits being incidental to the primary public purpose." *State ex rel. Atkinson v. Planned Industrial Expansion Authority of St. Louis*, 517 S.W.2d 36, 45 (Mo. banc 1975). *See also, State ex inf. Dalton v. Land Clearance for Redevelopment Authority of Kansas City*, 270 S.W.2d 44 (Mo. banc 1954), and *Land Clearance for Redevelopment Authority of St. Louis v. City of St. Louis*, 270 S.W.2d 58 (Mo. banc 1954).

Relator has failed to meet his burden of showing that the legislature's determination that the Act is to serve a public purpose is arbitrary and unreasonable. Moreover, the purposes of the Act are comparable to that contained in other legislation which has been held heretofore to be public ones.

For example, in *Jardon, supra*, relator attacked the Industrial Development Corporations Act because it allowed "the expenditure of public funds for other than a public purpose by authorizing the issuance of revenue bonds to finance facilities to be used by private corporations." *Id.* at 673. The Court held that the issuance of revenue bonds for commercial, industrial, agricultural and manufacturing facilities did serve the essential public purposes of improving employment and stimulating the economy. The same could be said for the issuance of revenue bonds pursuant to the purposes of this Act. Furthermore, facilitating the transportation of goods by sea as well as by land long has been recognized as a proper purpose for the expenditure of public funds. 26 R.C.L. § 36 (1920). *See also, North Carolina State Ports Authority v. Citizens Bank & Trust Co.*, 242 N.C. 416, 88 S.E.2d 109, at 112 (1955) wherein it was said:

Adequate transportation facilities, by water as well as by land, stimulate economic growth by making possible the satisfactory and profitable marketing of the products of farm and factory. Conversely, lack of such facilities retards economic development.

For other cases finding that a port authority serves a public purpose, see: *Sigman v. Brunswick Port Authority*, 214 Ga. 332, 104 S.E.2d 467 (1958); *Lerch v. Maryland Port Authority*, 240 Md. 438, 214 A.2d 761 (1965); *Visina v. Freeman*, 252 Minn. 177, 89 N.W.2d 635 (1958); and *Harrison v. Day*, 202 Va. 967, 121 S.E.2d 615 (1961).

Relator seeks to distinguish this case from earlier cases in which statutes authorizing the issuance of revenue bonds to aid private corporations were upheld as serving a public purpose.

■ First, relator says, this Act does not contain any legislative statement that bonds are issued by a port authority for an essential and governmental purpose or that an authority's exercise of its powers is the performance of an essential public function. The presence or absence of such wording in a statute is not conclusive of the existence of an essential and governmental purpose

or of the use of powers to perform an essential public function. If it were otherwise, the rule that a legislative determination of public purpose is entitled to great deference would become instead a rule of absolute deference and judicial abdication. We have applied the prevailing test to determine if a public purpose is served by the Act, and the fact that this Act's purpose was stated in terms less grand than those used in previous Acts cannot change the result of the test.

■ Second, relator says that unlike the local authority in *Jardon*, this Authority does have access to public funds from general tax revenues in addition to funds from the proceeds of the sale of revenue bonds. The public funds to which relator refers are those received from the general treasury of the county to pay the Authority's start–up expenses and a grant from the state to conduct a feasibility study. Although not entirely clear, we assume this claim is in reference to Mo.Const. art. X, § 3, which states, "Taxes may be levied and collected for public purposes only . . . ." A claim under this section was rejected in *Jardon* for the reason that the section is confined expressly to tax revenues and the authority there did not levy or collect taxes and did not exercise any taxing power. The same is true here, and additionally, the expenditure of public funds from the general tax revenues for the limited purposes described herein would be presumptively valid because the purposes for which they were spent were public ones.

The last distinguishing factor urged by relator is that the nature of the activity being financed here is quite different from activities approved previously in that the public never will be able to use these facilities directly or to benefit directly from their operations. Our finding of a public purpose in the Act refutes this claim, and relator's citation of *State ex rel. Keystone Laundry & Dry Cleaner, Inc. v. McDonnell*, 426 S.W.2d 11 (Mo.1968), in support ignores our reading of that case in *Jardon*. We find that the nature of this Act in no way deprives it of a public purpose, and that im-

proved economic conditions resulting from the development of the port will directly benefit the public.

II. *The Act constitutes an unlawful delegation of legislative power without adequate standards.*

■ Mindful of the axiom that all presumptions are in favor of the constitutionality of a statute, we find relator's claims of improper delegation to be without merit. "All must and do concede that the legislature may not relegate to an administrative officer or board its power to legislate, . . . (but) the legislature may enact the basic purpose or rule, leaving matters of detail in administering the act to the board or executive, although an exercise of discretion by the latter may thus be involved." *State ex rel. Priest v. Gunn*, 326 S.W.2d 314, 320 (Mo. banc 1959). The discussion of the delegation issue in *Menorah* and in *ABC Security Service, Inc. v. Miller*, 514 S.W.2d 521 (Mo. 1974), and in the cases cited therein, makes clear that this Court follows the modern tendency toward greater liberality in permitting grants of discretion.

Relator suggests that because the Act grants authority to deal with so many different types of projects, any decisions required in approving one project over another necessarily will result in the making of legislative policy determinations. Any delegation present in this Act involves only a "fleshing out" of the General Assembly's declared policy of encouraging development of port facilities to improve water–borne commerce and the economic benefits to the public inherent therein. As the Florida Supreme Court said in a case cited by relator in support of this attack, "for an administrative agency to 'flesh out' an articulated legislative policy is far different from that agency making the initial determination of what policy should be." *Askew v. Cross Key Waterways*, 372 So.2d 913, 920 (1978). The General Assembly made the initial policy decision on the need for permitting cities and counties to form port authorities. The powers given to each authority simply enable the effectuation of that policy.

The power to acquire property by condemnation under § 68.025.1(13) also is attacked as a delegation of a fundamental legislative power. In support relator cites *Bowman v. Kansas City*, 233 S.W.2d 26 (Mo. banc 1950), wherein this Court said at 29 that "the utility of the proposed improvement, the extent of the public necessity for its construction, the expediency of constructing it, the suitableness of the location selected for its site are all questions exclusively for the legislature to determine, and the courts have no power to interfere or to substitute their own views for those of the representatives of the people." This statement was made in response to a claim that certain evidence of the necessity and expediency of the proposed taking were excluded improperly during the trial of a class action suit seeking to enjoin Kansas City from appropriating or expending public funds under an ordinance alleged to be illegal. In holding that the exclusions were proper, the Court gave the reason quoted above. As is obvious, no issue of improper delegation was presented in *Bowman*, and citation of the case is unpersuasive in this context.

"The power of eminent domain is an inherent attribute of every sovereign government, not dependent upon constitutional grant, and the right to exercise that power is exclusively a legislative function and prerogative, subject only to constitutional limitations. Thus, the legislature may exercise the power of eminent domain or *may authorize its exercise by others and the legislature has like authority to determine what, if any, regulations should be enacted to control exercise of such power when delegated.* The necessity, expediency and propriety of exercising the power of eminent domain are questions essentially legislative (or, as is sometimes said, political), and not judicial, in nature, and *a grant of the power by the General Assembly carries with it the right to determine essentially legislative (or political) questions.* [citations omitted]." *State ex rel. Coffman v. Crain*, 308 S.W.2d 451 (Mo.App.1958). (Emphasis added).

The General Assembly did not exceed its power in authorizing port authorities to exercise the right of eminent domain and has limited that exercise to areas approved by the legislative body of each city or county creating a port authority and to property not being used actively in relation to or in conjunction with river trade or commerce. Any "legislative" questions arising outside these limits are to be answered by the port authority in accordance with the right to make such decisions which accompanies the grant of eminent domain power. Such a right does not constitute an unlawful delegation of legislative power under these facts.

■ To the extent that the Act properly delegates administrative functions, relator claims that the Act still is unconstitutional because it does not contain clear and sufficient legislative standards to guide those whose responsibility it is to carry out those functions. Although similar claims have been rebuffed in recent cases (*Menorah Medical Center, supra; ABC Security Service, Inc., supra*) guidance for those dispositions appears in much earlier cases. For example, in *Spitcaufsky v. Hatten*, 353 Mo. 94, 182 S.W.2d 86 (banc 1944), [overruled on another issue in *Manchester Fire Protection v. St. Louis*, 555 S.W.2d 293 (Mo. banc 1977)] the Court upheld the constitutionality of the Land Tax Collection Act. One challenge to the act was that legislative power had been delegated to the Land Trust without any definite standards for guidance, resulting in the trust having unfettered discretion in appraising land and in the handling and sale thereof. In response the Court said 182 S.W.2d at 109:

> [T]he Act does not leave the Land Trust without guidance. In twelve long sections its powers and duties are stated in detail, . . . . Under the decisions, this need be done only within practicable limits, leaving to the administrative delegatee the interpretative power of filling in the details. (footnote omitted). And it is clear that the Legislature could not have prescribed all the details in appraising, handling and selling many tracts of land. It might have made other requirements

for the selection of the appraisers, but that was a matter for Legislative determination.

This view is equally applicable to respond to the claims of unlawful delegation lodged here by relator. In particular, relator notes the lack of adequate standards to guide: (1) the State Transportation Commission in its approval of various aspects of the establishment of a port authority; (2) a local government in establishing port district boundaries; or (3) a port authority in conducting its operations. To the contrary, we believe the standards given are adequate, it being clear that the legislature could not have prescribed all the details incident to establishing and operating a port authority.

In § 68.010.2 the General Assembly listed six criteria[3] the transportation commission "shall consider" in determining whether to approve an application to form a port authority. In addition, the legislature stated in § 68.010.3 that no city shall create a port authority if it is located within a county that has created an approved port authority.

As to establishment of port district boundaries, the legislative body of each county or city seeking to create a port authority must limit the area it seeks to designate as one that "shall be or could be reasonably connected to the business of a port." See, § 68.015.1. In other sections of the Act the legislature listed the kinds of facilities and activities it determined could be related to the activities of a port: industrial facilities and industrial parks (§ 68.020); and recreational facilities, terminals, terminal facilities, warehouses [§ 68.025.1(11) and .2]. The language of § 68.015 coupled with language throughout the Act provides sufficient guidance to local legislative bodies as to the clear intent of the General Assembly, yet permits those with superior knowledge of local needs and capabilities to fill in the details.

In relation to *operation* of the port authority, relator specifically notes lack of standards for an authority to use in: (a) approving the construction of piers [§ 68.025.1(8)]; (b) constructing and leasing industrial parks or facilities [§ 68.025.1(11)]; (c) acquiring property by negotiation or condemnation [§ 68.025.1(13)]; (d) employing such "other assistance as it may deem advisable" [§ 68.025.1(16)]; (e) deciding when private operators are not "interested or available" so as to permit the authority to operate a facility itself [§ 68.025.2]; or (f) issuing bonds [§ 68.040].

The standards to be used by an authority in exercising its various powers as set out in § 68.025 are implicit in the General Assembly's statement of the purposes of a port authority in § 68.020. In approving the construction of piers, for example, the authority must consider whether it "[will] promote the general welfare, . . . encourage private capital investment by fostering creation of industrial facilities and industrial parks within the port district, . . . increase the volume of commerce and ... . . promote the establishment of a foreign trade zone within the port districts." The legislature included additional standards for certain powers, such as the use of the right of eminent domain, about which it stated in § 68.025.1(13): "The power of eminent domain shall not apply to property actively being used in relation to or in conjunction with river trade or commerce." In view of the purposes set out by the legislature, more specific guidelines as to a port authority's enumerated powers were not needed.

Relator also claims that the alleged lack of adequate guidelines is a violation of Mo.

---

**3.** Such points of "guidance" are: "(1) The population of any city and/or county submitting the application; (2) the desirability and economic feasibility of having more than a single port authority within the same geographic area; (3) the technical and economic capability of participating cities and/or counties, as well as private interests, to plan and carry out port development within the proposed district; (4) the amount of actual and potential river traffic that would make use of any facilities developed by a port authority; (5) the potential economic impact on the immediate area from which the application originates; and (6) the potential impact on the economic development of the entire state and how the proposed port authority's developmental activities relate to any state plans."

# 601

Const. art. I, § 10, the due process guarantee. The violation occurs, he contends, because there is no statutory mechanism for promulgating any rules, policies or criteria of general applicability for local port authorities; and this void means that the legitimate expectations of the people of Missouri that there will be established procedures to protect them from arbitrary treatment by an administrative agency go unfulfilled. At least part of this contention ignores the existence of Chapter 536, RSMo 1978, and Rule 100 on administrative procedure and review for promulgating rules and regulations. The guidelines in Chapter 68 coupled with those of Chapter 536 are sufficient to protect against arbitrary treatment by a port authority.

III. *The Act permits exercise of the power of eminent domain for private use.*

The General Assembly's right to delegate its power of eminent domain has been considered and reaffirmed heretofore. In addition, we have determined that the Act serves a public purpose. These issues were properly within the scope of quo warranto proceeding. To determine, as relator requests, whether the Act permits a *particular* exercise of the power of eminent domain to obtain land or facilities to be used by private corporations in violation of Mo. Const. art. I, § 28 "that private property shall not be taken for private use" would be beyond the scope of this proceeding. The writ of quo warranto is not to be used to prevent an improper exercise of power lawfully possessed. *State ex inf. McKittrick v. Murphy,* 347 Mo. 484, 148 S.W.2d 527, 530 (banc 1941). Having determined that the power of eminent domain is lawfully possessed, the question of the proper use of that power is one to be answered in a separate proceeding if an improper taking is alleged to have occurred.

IV. *The Act contains more than one subject and the contents are not clearly expressed in the title.*

Article III, § 23 of the Missouri Constitution provides, "No bill shall contain more than one subject which shall be clearly expressed in its title . . . ." Relator contends that this Act violates this section in two ways: (1) The Act's title, "An Act relating to the Establishment of Port Authorities and Port Districts," does not clearly express its subjects, and (2) the Act contains more than one subject.

The controlling test, as most recently set out in *State ex rel. Jardon, supra,* at 677, is "whether or not all of the provisions of the statute fairly relate to the same subject, have a natural connection therewith and are the incidents or the means to accomplish its purpose. *State ex inf. Barrett ex rel. Bradshaw v. Hedrick,* 294 Mo. 21, 241 S.W. 402 (banc 1922); *Thomas v. Buchanan County,* 330 Mo. 627, 51 S.W.2d 95 (banc 1932)."

Specifically, relator criticizes the title because there is no mention of the powers and purposes of port authorities under the Act and no reference to the powers of the State Transportation Commission. As this Court has said before, the title to a statute "needs only to indicate the general contents of the act, and if the contents fairly relate to and have a natural connection with the subject expressed in the title they are within the purview of the title." *State ex rel. Jardon, supra,* at 677, *State v. Weindorf,* 361 S.W.2d 806, 809 (Mo.1962); and, *State v. King,* 303 S.W.2d 930, 932 (Mo.1957). The enumerated powers and purposes of a port authority included in the statute have a natural connection with the establishment of port authorities and port districts and in no way contravene the two tests set out heretofore. Accordingly, we rule against relator on this point.

The other defect relator alleges is that the title gives no notice that industrial parks, industrial facilities and warehouses may be built; that an authority has the power to enter into interagency agreements or to exercise eminent domain; and that powers of the state transportation committee are included therein. Again, we declare that the provisions in the Act fairly relate to the same subject—the establishment of port authorities and districts—and have a natural connection therewith and are the

incidents or the means to accomplish its purposes. The strictures of Art. III, § 23, whose basic purpose was to prevent members of the General Assembly and the public from being misled as to what a bill contains, [*State ex rel. United Rys Co. v. Wiethaupt*, 231 Mo. 449, 133 S.W. 329 (banc 1910)], are met by this title.

V. *The Act allows the State to incur illegal liabilities.*

Relator argues that because (1) the Authority already has received funds from the state in the form of a grant to conduct a feasibility study; and (2) a port authority may receive additional state funds other than those already received; and, (3) there is no express prohibition as to the use of this state money or as to a local authority's power to issue bonds that are repayable from revenues other than those derived from projects undertaken by the authority, the Act is violative of art. III, § 37 of the Missouri Constitution which, generally, prohibits the general assembly from contracting or authorizing the contracting of any liability of the state or to issue bonds therefor.

The aforementioned section of the Constitution is directed to contractual liability of the state. *Board of Public Buildings v. Crowe*, 363 S.W.2d 598 (Mo. banc 1962). Moreover, § 68.040.2 makes clear that the state is not to be liable on any notes or bonds of any port authority and that information to this effect must appear on the face of any such note or bond. The parties here have stipulated that the bonds of all phases of the project will be payable solely out of rents and revenues derived by the Authority from the lease or sale of the respective "phase". The contract to be created by the bonds does not constitute such an indebtedness as is contemplated by the state constitution.

VI. *The Act permits the unauthorized lending of credit.*

Relator also claims that the Act violates Mo.Const., art. III, §§ 38(a) and 39(1) and (2) by permitting the lending of credit, the transfer of property and the making of grants by the state to a private person, association or corporation. Both claims are directed towards §§ 68.030, 68.035 and 68.-040.

As to § 38(a), which states that the General Assembly "shall have no power to grant public money or property, or lend or authorize the lending of public credit, to any private person, association or corporation," this Court determined in *Americans United v. Rogers*, 538 S.W.2d 711 (Mo. banc 1976), *cert. denied*, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976), that "the presence of a legitimate 'public purpose' makes society or the people of this state the direct beneficiar[ies] of the expenditures," and on that basis found no violation of this section of the state constitution. For the same reason that the purposes of this Act are legitimate public ones, this point is denied.

Sections 39(1) and (2) prohibit the lending or pledging of credit of the state to any person, individual, association, municipal or other corporation. The argument pertaining to these sections mirrors that rejected by this Court in *State ex rel. Farmers' Electric Cooperative, Inc. v. State Environmental Improvement Authority*, 518 S.W.2d 68 (Mo. banc 1975). Here, as there, a statute specifically declares that the state shall not be liable on any notes or bonds of any authority, that any such notes or bonds shall not be a debt of the state and that information to that effect shall appear on the face of any such note or bond. § 68.-040.2. Furthermore, as in *Farmers' Electric Cooperative*, the Authority here is a separate entity, within the meaning of that term as discussed in *Menorah Medical Center, supra*, at 82; *State ex rel. Jardon, supra*, at 669; *State ex rel. Farmers' Electric Cooperative, Inc., supra*, at 73; *State ex rel. Curators of University of Missouri v. McReynolds*, 354 Mo. 1199, 193 S.W.2d 611 (banc 1946); *State ex rel. State Highway Commission v. Bates*, 296 S.W. 418 (Mo. banc 1927). Therefore, if there were any liability on the bonds for which the Authority was responsible, the state's credit in no way would be involved because the Authority is a recognized separate entity from the state.

VII. *The Act is a proscribed local or special law.*

 First, relator attacks the Act as being an impermissible local or special law in violation of Mo.Const. art. III, § 40. In construing art. IV, § 53, ¶ 32 of the 1875 Missouri Constitution, which differs very little from the current section, this Court determined that there are two types of general laws: (1) those that apply to a reasonable and natural class, and (2) those that cover the state as a whole. *State ex inf. Gentry v. Armstrong*, 315 Mo. 298, 286 S.W. 705, 709 (banc 1926). Within the first category, a class created must have a reasonable basis and the courts are ultimately responsible for such a determination.

Although relator suggests that the statutory statement of the purposes of port authorities is much broader than the promotion of waterborne commerce, thereby making underinclusive the class composed only of cities and counties next to waterways, we do not find this to be so after examining the Act in its entirety. One of the purposes stated in § 68.020 is "to increase the volume of commerce . . . within the port districts." Any area to be designated as a port district "shall be or could be reasonably connected to the business of a port." § 68.015. The fact that the transportation commission is given the authority to approve or disapprove applications for formation of a port authority further indicates that the purposes of the Act are logically connected to the functions of that commission, which pursuant to Mo.Const. art. IV, § 32(a) "shall have power and authority in regard to matters pertaining to modes and systems of transportation . . . as may be provided by law." Waterborne commerce would come within that authority. § 68.065(1) and (6). Reference throughout the Act to navigable waters, river traffic, wharves, piers, bulkheads, jetties, harbors, floating equipment and waterborne commerce guides us to the conclusion that the Act's primary focus and purpose is improving waterborne commerce. That being the case, the distinction made between cities and counties situated upon, adjacent to and embracing within their boundaries a navigable waterway and those that are not is reasonable and not arbitrary. The Act therefore is not a special or local law within the meaning of art. III, § 40.

 Second, the presence of different standards for approval of port authorities in certain localities as provided in § 68.010 also makes the Act a special or local law, relator contends. He refers to §§ 68.010.1 and 68.010.2(6) that declare that certain cities and counties (the City of St. Louis and Jackson County or Kansas City) already qualify for approval as port authorities, yet other cities and counties must apply for approval by the transportation commission and be judged by the criteria set out in § 68.010.2. Relator perceives this statutory scheme as a failure to apply the criteria uniformly without a reasonable basis for so doing, thus making the Act a special or local law. We disagree. As this Court said in *City of Kirkwood v. Allen*, 399 S.W.2d 30 (Mo. banc 1966):

> The Legislature is deemed to have been familiar with the constitutional prohibition against local or special laws [citations omitted] and when the words used permit a reasonable construction consistent with the obvious legislative intent and within constitutional limitations, a construction leading to the invalidity should be avoided.

*Id.* at 36.

With this in mind and indulging a presumption in favor of the constitutionality of the Act, we conclude that the General Assembly did not fail to apply the criteria uniformly. Clearly, it applied them to those cities and counties about which it determined it had sufficient information to do so. As to the other cities and counties, the legislature left the determination of their fitness to those who possessed superior knowledge of the area. This distinction does not create a special or local law because every port authority is subject to the same considerations as to fitness. The only difference in the statutory scheme is that in certain instances the General Assembly applied the criteria and made the determination and in other

instances it left the application of the criteria to another governmental unit.

Third, even if the Act is a permissible local or special law under art. III, relator claims, it still is invalid as violative of § 42 of that article which requires publication of local notice. Because we have determined that the Act is not a local or special law, no published notice in the locality was required and § 42 was not violated.

VIII. *The Act violates various provisions dealing with local finances.*

Relator collects several objections under this point, citing Mo.Const. art. VI, §§ 23, 23(a), 25, 26(a), (b), and (c) and 27. The claims under §§ 23 and 25 were disposed of, *supra*, in point I, wherein the Act was found to have a public purpose.

The Act also is criticized as an attempt to circumvent §§ 23(a) and 27, which require the approval of two–thirds of the qualified electors for certain kinds of indebtedness. Here, as in *Jardon*, this issue turns on whether or not a port authority is a separate and distinct legal entity, not only from the state, but also from the city or county in which it may be established. None of relator's contentions in this regard is convincing, and we find *Jardon* to be controlling of this issue.

As to § 26,[4] an authority does not come within the limits therein, because as discussed *infra* at IX., a port authority is not a political subdivision.[5]

IX. *The Act grants unauthorized tax exemptions.*

Section 68.040.5 exempts port authorities from paying "any taxes or any assessments whatsoever to this state or to any political subdivisions, municipality or other governmental agency of this state." In addition,

under that section the notes and bonds of every port authority and the income therefrom are exempted from any taxes or assessments, except for death and gift taxes and taxes on transfers.

This exemption is attacked as contrary to art. X, § 6 of the Missouri Constitution, which provides:

All property, real or personal, of the state, counties, and other political subdivisions, and non profit cemeteries, shall be exempt from taxation; and all property, real or personal, not held for private or corporate profit and used exclusively . . . for purposes purely charitable . . . may be exempted from taxation by general law. . . . All laws exempting from taxation property other than the property enumerated in this Article, shall be void.

Respondent replies that pursuant to § 68.010 a port authority is a political subdivision of the state and therefore all its property is exempt from taxation. Although it is true that the General Assembly denominated every port authority as a *political subdivision*, we are compelled to apply the constitutional definition of political subdivision found in art. X, § 15 in determining whether an entity is entitled to the exemption of § 6.

The Missouri Constitution lists several entities that shall be considered political subdivisions and completing the list is "any other public subdivision, public corporation of public quasi–corporation having the power to tax." In keeping with this language, this Court has determined that an authority without the power to tax does not fall within the definition of § 15 and therefore is not a political subdivision. *Menorah Medical Center, supra,* at 81. The legislature's use of the phrase "political subdivisions" in ref-

---

**4.** The pertinent language of the subsections of § 26 dealing with local indebtedness is:

[No or any] county, city, incorporated town or village, school district or other political corporation or subdivision of the state . . .

**5.** The definition of "other political subdivision" in art. X, § 15 includes the term as used in that article. No other definition for "political subdivision" appears in the constitution. After re-

viewing the constitutional debates of 1875 and 1945, we find no evidence to indicate that the framers intended the phrase "political subdivision" to be defined and used differently in different articles. The apparent purpose of finally including a definition was to give the courts, which previously had defined the term in a variety of ways, some guidance as to the framer's intentions.

erence to port authorities does not operate to bring them within the constitutional definition.

■ As to the exemption for property used for "purposes purely charitable," the requirements for that exemption as most recently set out in *Barnes Hospital v. Leggett*, 589 S.W.2d 241 (Mo. banc 1979), are:

(1) it must be actually and regularly used exclusively for purposes purely charitable as "charity" is defined in *Salvation Army v. Hoehn*, 354 Mo. 107, 114, 115, 188 S.W.2d 826, 830 (1945); (2) it must be owned and operated on a not–for–profit basis; and (3) the dominant use of the property must be for the benefit of an indefinite number of people and must directly benefit society generally.

*Id.* at 244.

To the extent that the power of the legislature to so provide is concerned, the exemption provided in § 68.040.5 is valid. No further determination as to its validity can be made at this time because the facts before us do not lend themselves to examination under the prevailing test. The validity of an exemption is to be determined in light of how the property in question is being "actually and regularly used exclusively" at the time of the assessment. This information does not exist at this time, preventing this Court from applying the *Barnes Hospital* test with any meaning. We therefore do not rule on this point.

X. *The Act permits use of tax revenues for private purposes.*

■ Relator also criticizes the Act as violative of Mo.Const. art. X, §§ 1 and 3 [6] by permitting the use of tax revenues for non–public purposes. Specifically, relator claims that the Act violates these provisions because under the facts tax revenues can be used for non–public purposes in connection

with the administration of a port authority and may be used to repay bonds issued by an authority. Without accepting these speculations as true, we rule against this point because the revenues, in any event, are being used for public purposes, as previously determined herein.

XI. *The Act is impermissibly vague.*

■ The incorporation of "procedures now and hereafter conferred upon or applicable to the environmental improvement authority, chapter 260, RSMo, relating to the manner of issuance of revenue bonds and notes . . . insofar as they are consistent with the necessary and proper undertaking of [a port authority's] purposes" in § 68.040(6) renders the Act void for vagueness, relator claims. We find this point to be without merit. None of the cases cited to this Court and none discovered through independent research arbitrarily invalidates an "incorporation by reference" for the sole reason of vagueness. Instead the cases focus on the effect of such an incorporation, especially when the statute included by reference is amended after its incorporation.

■ Although relator does not so articulate, we discern that his complaint is that the incorporation of chapter 260 does not comport with the general rule that an act of the legislature, to have the force and effect of law, must be expressed intelligibly and statutes that are too vague to be intelligible are void. 82 C.J.S. *Statutes* § 68 (1953). This rule applies as well to references within a statute as to laws outside the statute. In this regard a general reference to other laws will not in itself make an act vague and insufficient, as long as the referring statute and those referred to are themselves clear. *Id.* at § 68e. Cases in Missouri do not set out a clear standard by which to measure incorporation by reference.

6. These sections provide:

Section 1. The taxing power may be exercised by the general assembly for state purposes, and by counties and other political subdivisions under power granted to them by the general assembly for county, municipal and other corporate purposes.

Section 3. Taxes may be levied and collected for public purposes only, and shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax. All taxes shall be levied and collected by general laws and shall be payable during the fiscal or calendar year in which the property is assessed. Except as otherwise provided in this constitution, the methods of determining the value of property for taxation shall be fixed by law.

This Court has cited with approval the holdings of early English and Missouri cases to the effect that a general reference by one statute to another may be valid and will adopt the related and congruous portions by the latter. *State ex rel. Cairo Bridge Commission v. Mitchell*, 352 Mo. 1136, 181 S.W.2d 496, 499 (banc 1944). More recently the Court in *City of Warrensburg v. Board of Regents of Central Missouri State University*, 562 S.W.2d 340 (Mo. banc 1978), quoted another standard with approval:

Where one statute adopts the particular provisions of another by a specific and descriptive reference to the statute or provisions adopted, the effect is the same as though the statute or provisions adopted had been incorporated bodily into the adopting statute.

*Id.* at 344.

The General Assembly specifically limits the application of chapter 260 to those procedures set out therein relating to the manner of issuance of revenue bonds and notes. Under either standard approved by this Court, the language of the incorporating statute is sufficiently specific as to express intelligibly the intent of the legislature and to guide a port authority in the issuance of its bonds and notes. The incorporation is valid.

XII. *Miscellaneous attacks.*

Relator argues that the parts of the Act attacked as invalid are not severable, thereby requiring that the entire Act be declared unconstitutional. Severability is not an issue before us because none of the sections upon which we specifically have ruled have been found to be unconstitutional.

Contained within relator's last point are several subpoints directed at showing that the South Mississippi project is not authorized by the Act. In particular, relator claims: (1) the project is not within a properly designated port district; (2) Phases I and II involve an illegal sale of facilities and an illegal bond issue; (3) Phase III is not authorized by the Act because it contemplates the construction of a truck transportation facility not adjacent to a navigable waterway; (4) the Authority intends to violate the requirement of § 68.055.1 on competitive bidding; and (5) the Authority is not empowered to execute a mortgage or indenture of trust.

As to points (1), (3), and (4), we are constrained from reaching these issues by the holding of *State ex inf. McKittrick v. Murphy, supra,* that the writ of quo warranto is not to be used to prevent an improper exercise of power lawfully possessed.

 In point (2) relator contends the Authority's power to sell facilities and issue revenue bonds is limited by § 68.025.1(12) and § 68.040.1 to be consistent with the purposes of the port authority. Because these sections were enacted in 1974 and were not changed by the later amendment, relator claims they must be read in terms of the 1974 version of the purposes of the port authority, and not in conjunction with the expanded version of the purposes of the port authority as set out in the amendment. Relator's citation to *State ex rel. Klein v. Hughes*, 351 Mo. 651, 173 S.W.2d 877, 880 (1943); *State ex rel. Dean v. Daues*, 321 Mo. 1126, 14 S.W.2d 990, 1002 (1928); and, *Strottman v. St. Louis, I., M., & S. Railway*, 211 Mo. 227, 109 S.W. 769 (banc 1908) misses the mark. First of all, the issue in these cases was whether the re—enactment of a law after it has been construed by a court to have a particular meaning permits a new and different construction. Obviously no such issue is present here. Secondly, although relator apparently cites these cases for the holding that the presumption in statutory construction is that the legislature intended unamended parts of an act to remain operative and effective as before, he overlooked the further holding that the whole statute as amended should be construed on the theory that the lawmakers intended to accomplish something by the amendment. We conclude that the General Assembly intended to define more precisely the purposes of a port authority by its amendment and implicit in that was the giving of further guidance to port authorities in areas such as sales of facilities and issuance of revenue bonds.

 The fifth point involves a question of whether the Authority has the power to issue bonds, in the words of the Authority's

resolution, "pursuant to an indenture of mortgage and deed of trust and will be secured by pledge of rentals and other payments made by Bussen Realty Company pursuant to the aforesaid lease and by a mortgage on the property described in that lease."

Of those parts incorporated by reference from chapter 260 is § 260.060 detailing what the resolution authorizing notes and bonds may contain. That section reads in part:

A resolution of the authority authorizing the issuance of any notes or bonds or any issue thereof may provide that such notes or bonds shall be secured by a trust agreement between the authority and a corporate trustee, vesting such property, rights, powers and duties in trust as the authority may determine. Any such trust agreement may pledge or assign the revenues of the authority or any part thereof, to secure the payment of any notes or bonds. . . . Such trust agreement may contain such other provisions as the authority determines reasonable and necessary for the security of the noteholders and bondholders. . . .

This section provides express authority for the Authority to enter into a trust agreement as contemplated by the quoted resolution. Having determined that the Authority lawfully possesses this power, no further consideration is warranted here.

### Conclusion

Pursuant to the foregoing, relator's information in the nature of quo warranto is dismissed.

BARDGETT, C. J., and SEILER and HIGGINS, JJ., concur.

DONNELLY, J., concurs in separate concurring opinion filed.

WELLIVER, J., dissents in separate dissenting opinion filed.

RENDLEN, J., dissents and concurs in separate dissenting opinion of WELLIVER, J.

DONNELLY, Judge, concurring.

The whittling away of the *nondelegation doctrine* "is wrong * * * because it is undemocratic, in the quite obvious sense that by refusing to legislate, our legislators are escaping the sort of accountability that is crucial to the intelligible functioning of a democratic republic." John Hart Ely, *Democracy and Distrust* 132 (Cambridge: Harvard University Press, 1980). *See also Industrial Union Dept. v. American Petrol. Institute,* —— U.S. ——, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (Rehnquist, J., concurring in result); *Menorah Med. Center v. Health and Educ. Facil. Auth.,* 584 S.W. 2d 73, 88 (Mo. banc 1979) (Donnelly, J., dissenting).

However, I have no right to continue to array my judgment against that of the majority of this Court.

I concur.

WELLIVER, Judge, dissenting.

I respectfully dissent.

I believe that the time has come for us to reexamine the practice of entertaining friendly quo warranto proceedings where the bond issuing authority is the real party in interest and the purpose of the action is validation of the issue and enhancement of its salability.