**In the Matter of FABIUS RIVER DRAINAGE DISTRICT.**

**No. ED 77210.**

Missouri Court of Appeals,
Eastern District,
Northern Division.

Nov. 21, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 9, 2001.

Application for Transfer Denied
Feb. 13, 2001.

Phillip E. Morgan, Paul R. Sterrett, Rich Tiemeyer, Chesterfield, for appellant.

David R. Human, Timothy C. Sansone, Ziercher & Hocker, P.C., St. Louis, Myrl B. Sternke, Palmyra, for respondent.

TEITELMAN, Judge.

Missouri Highway and Transportation Commission (MHTC), the Exceptor in the underlying action, appeals from the judgment entered in the Circuit Court of Marion County in favor of the Fabius River Drainage District on the District's read-

justment of benefits for property owned by MHTC.[1] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The Circuit Court of Marion County formed Fabius as a drainage district in 1914, pursuant to provisions codified in Chapter 242 RSMo. Following Fabius's formation, MHTC, a branch of the Missouri Department of Transportation (MODOT), acquired lands within Fabius and constructed "Public Highway 24" and "Public Highway 61," both of which have enjoyed substantial benefits provided by Fabius over many years. In 1960, Fabius raised and strengthened its levees to protect additional lands that previously were not protected from flooding. Over time, the value of properties protected by Fabius increased significantly; as a result, in February 1998, the owners of more than 25% of the land within Fabius petitioned for a reassessment of benefits pursuant to Section 242.500, RSMo.[2]

Responding to these owners' requests, Fabius prepared and filed a Petition in two counts, asking that the trial court (a) extend the boundaries of Fabius to include the additional lands protected by the levee construction performed in 1960; and (b) order a readjustment of benefits. Fabius's Petition included a request that MHTC, which had never been assessed any benefits by Fabius, be included on the roll of property owners assessed, in accordance with Section 242.260.3.[3]

On March 2, 1998, MHTC filed a Motion to Dismiss and Suggestions in Support Thereof, arguing that Chapter 242 does not allow a drainage district to assess benefits with respect to lands owned by MHTC. On April 1, 1998, notwithstanding MHTC's Motion to Dismiss, the trial court heard Fabius's Petition and received Fabius's request for an appointment of three commissioners to reassess the benefits accruing to all lands and properties within Fabius. On June 10, 1998, the trial court issued its judgment, pursuant to which it (a) extended Fabius's boundaries to include the additional lands protected by the levee construction performed in 1960; (b) ordered a readjustment of the benefits; and (c) appointed three commissioners to perform the reassessment.

The commissioners presented their Report to the trial court on June 30, 1999, reducing the results of their examinations and findings to tabular form. The commissioners assessed benefits in the amount of $4,148,083 with respect to MHTC. Pursuant to the Commissioners' Report, MHTC would be required to pay an assessment of $24,888.50 per year. Also on June 30, 1999, the clerk of the trial court filed his Notice of Filing Commissioners' Report for Fabius River Drainage District.

On July 9, 1999, MHTC filed its Exceptions to the Commissioners' Assessment of Benefits and Request for Jury Trial, argu-

1. Fabius has filed a Motion to Dismiss Appeal, arguing that the court lacks jurisdiction because appeal does not lie from an assessment of benefits under Chapter 242. Considering the claims of error raised, we disagree. MHTC has challenged the authority of the Commission to levy an assessment against it, raising, among its multifarious issues, challenges to the proceedings employed by Fabius and the trial court, the constitutionality of the assessment as applied against MHTC, violation of the Hancock Amendment, and improper diversion of state road funds. As Chapter 242 requires strict compliance with the procedure outlined in the statute for Fabius to obtain an assessment of benefits and a levy of taxes against land, we are called upon to determine whether in fact statutory compliance occurred in this case. See *Peatman v. Worthington Drainage District*, 176 S.W.2d 539, 545–46, 238 Mo.App. 64 (Mo.App.1943). Fabius's motion is hereby denied.

2. All further statutory references are to RSMo 1994, unless otherwise indicated.

3. This section provides that "[t]he public highways, railroad and other rights-of-way, roadways, railroad and other property shall be assessed according to the increased physical efficiency and decreased maintenance cost of roadways by reason of the protection to be derived."

ing that the assessment against MHTC violated the Missouri Constitution and demanding that a "new assessment be made by a jury." Thereafter, on July 19, 1999, Fabius filed its Exceptions to the Commissioners' Report as to MHTC, contending that the assessment against MHTC was "inadequate in relation to the benefits afforded by the works and improvements of [Fabius]." Fabius also filed a Notice of Hearing to Confirm Commissioners' Report, subject to MHTC's and Fabius's exceptions.

On July 20, 1999, Fabius filed a Motion to Strike MHTC's Request for Jury Trial, arguing that Section 242.280 required the trial court to determine exceptions to the Commissioners' Report "in a summary manner so as to carry out liberally the purposes and needs of the district." Soon thereafter, MHTC attempted to serve interrogatories upon Fabius.

On August 4, 1999, the trial court entered its Order and Judgment Confirming Commissioners' report, pursuant to which it adopted and confirmed the Report, subject to MHTC's and Fabius's exceptions thereto.

Fabius then filed its Motion to Strike Interrogatories of MHTC, arguing that Section 242.280.1 does not authorize the use of interrogatories but instead requires the trial court to proceed "in a summary manner." MHTC filed Suggestions in Opposition to Fabius's Motion to Strike, contending that MHTC was entitled to use interrogatories in accordance with the Missouri Court Rules. Fabius then submitted suggestions in Support of its Motion to Strike Interrogatories of MHTC, and shortly thereafter filed Additional Suggestions in Opposition to Fabius's Motion to Strike Interrogatories.

The trial court entered an order sustaining Fabius's Motion to Strike Request for Jury Trial and Motion to Strike Interrogatories on October 7, 1999. Shortly thereafter, MHTC attempted to serve subpoenas duces tecum upon the three commissioners, as well as four members of Fabius's board of supervisors, requesting generally the same information that was sought in MHTC's previously propounded interrogatories, as well as information shared with Fabius's attorneys. On November 1, 1999, Fabius filed a Motion to Quash Issuance of Subpoenas Sought by MHTC and Suggestions in Support Thereof.

The trial on MHTC's and Fabius's exceptions occurred on November 2, 1999. As proceedings began, the trial court determined that it would take evidence from the parties, but would limit the witnesses in order to keep the proceedings "summary," as required by Chapter 242. The court allowed MHTC to call one commissioner and one supervisor. Having thus ruled on Fabius's Motion to Quash Issuance of Subpoenas sought by MHTC, the trial court invited MHTC to proceed.

MHTC presented the testimony of Marion H. Stewart, chairman of the three commissioners, Norman Haerr, president of Fabius's board of supervisors, Steven "Butch" Mundle, a maintenance superintendent for MODOT, and Glenn Rice, a senior highway designer for MODOT. Additionally, MHTC offered fifteen exhibits for the trial court's review.

Stewart, who brought certain documents sought by MHTC pursuant to its subpoena, testified that he and his fellow commissioners had meetings with Fabius and with representatives of MHTC and that the commissioners used various documents from MHTC to determine the benefits accruing to its lands and properties within Fabius; MHTC's attorney attended at least two of these meetings. MHTC introduced two exhibits showing the commissioners' assessment of benefits with respect to properties located in Marion County and Lewis County.

When asked how the commissioners determined the benefits afforded by Fabius to MHTC, Stewart testified that they reviewed a variety of factors to assess the increased physical efficiency and de-

creased maintenance cost of Public Highways 24 and 61 resulting from the existence and operation of Fabius, including, *inter alia,* the type of roadway operated by MHTC; the cost of constructing public highways within Fabius; the flood-related costs incurred by MHTC following the sabotage of Fabius's levee during the flood of 1993; the amount of land owned by MHTC; engineering information and data supplied by Mike Edwards, an engineer retained by Fabius; the cost of raising MHTC's highways several feet as an alternative to relying upon Fabius's levee and drainage system for protection from floods; and additional costs that, but for the existence and operation of Fabius, would have been incurred by MHTC as a result of the flood of 1993. With regard to the latter additional costs Stewart noted that, despite the sabotage committed during the flood of 1993, Fabius's levee still provided a great deal of protection during that flood, which would have caused much more damage and would have cost MHTC and other landowners within Fabius much more money if the levee and drainage system did not exist at all. After reviewing or considering these and other factors, the commissioners determined that the increased physical efficiency and decreased maintenance cost of Public Highways 24 and 61 resulting from the existence and operation of Fabius benefited MHTC in the amount of $4,148,083. Pursuant to the Commissioners' Report, MHTC would be required to pay an assessment of $24,888.50 per year.

When asked how the commissioners determined the benefits accruing to Lewis County and Marion County, the owners of two gravel roads located within Fabius, Stewart stated that the commissioners used information regarding the cost of repairing those gravel roads after the flood of 1993. Additionally, the commissioners took into consideration the fact that those gravel roads benefited Fabius as well by enabling employees and agents of Fabius "to get around the district." In contrast, he stated that MHTC's Public Highways 24 and 61 did not provide Fabius's employees similar accessibility to any great extent. MHTC also queried why the commissioners considered MHTC's cost to operate shuttle boats for cars attempting to use Public Highways 24 and 61 during the flood of 1993. Stewart replied that MHTC would not have incurred that cost if the highways had not been flooded, so the commissioners took that cost into account.

On cross-examination by Fabius, Stewart testified that the commissioners also considered gauge summaries or "river levels" to determine how many days each year Public Highways 24 and 61 would be flooded if Fabius did not exist at all.[4] Stewart added that the commissioners considered the increased maintenance costs that would have been incurred by MHTC as a result of filling and silting in the ditches next to MHTC's highways, the washing out of portions of the highways or their embankments, scouring caused by currents running north and south, and the depositing of trees, sand, silt, and debris. Additionally, Stewart stated that the commissioners did not include in their figures and calculations those days or months during the 1990's when water would have been below the roadbed but still high enough to threaten the highway embankment.

When asked what other benefits Fabius provides to MHTC, Stewart testified that Fabius's pump station and drainage system keep water off the public highways and away from MHTC's roadbeds, including water from the Mississippi River, the North Fabius River and local creeks. Stewart also stated that the existence and

---

4. For example, during 1993, the water level outside Fabius's levee was higher than the elevation of MHTC's roadbed during part of March and October, most of September, and all of April, May, June, July and August. In other years during the 1990's, the water level was higher than MHTC's roadbed at various times during three or four months each year, except in 1994.

operation of Fabius prevents MHTC from having to redirect, transport, and reroute traffic that would not be able to use Public Highways 24 and 61 when the water level outside the levee exceeds the level of the roadbed.

On redirect, Stewart testified that even if MHTC would not necessarily close a public highway when it is flooded, such a condition represented decreased physical efficiency. Additionally, referring to data obtained by the commissioners during the assessment process, Stewart stated that, but for the existence and operation of Fabius, MHTC's highways would have been closed 42.4 days per year, on average, over a ten-year period.

Finally, on recross examination, Stewart noted that the commissioners also considered the effects of standing water abutting the pavement and saturating the embankment of Public Highways 24 and 61, including the fact that after the sabotage in 1993, when the embankment of portions of those highways became saturated, water squirted through the joints in the pavement as vehicles passed over them.

MHTC then presented the testimony of Haerr, who also brought certain documents sought by MHTC pursuant to its subpoena. Haerr testified that he and other members of Fabius's board of supervisors met with the commissioners approximately three times. Haerr, a member of the board for approximately twenty-five years, noted that the board informed the commissioners about the significant development that had occurred within Fabius, including commercial building, the completion of the four-lane highways operated by MHTC, and the enlargement of Burlington Northern's railroad yards. In light of these historical changes, landowners within Fabius told the board "to go ahead and reassess."

On cross-examination, Haerr testified that the last assessment of benefits performed on behalf of Fabius occurred in 1917, and that the decision to reassess benefits was made so that the lands and properties within the entire district could be reassessed. On redirect, MHTC asked Haerr whether the commissioners made any other assessment comparable to that received by MHTC. He responded that the commissioners assessed the Burlington Northern Santa Fe Railroad $5,610,000.

Next, MHTC presented the testimony of Mundle, an employee of MODOT for twenty-three years. Mundle testified that MHTC closes a road when there are more than six inches of water on it. He acknowledged that, whether the roadway remains open or not, MHTC incurs costs whenever there is water on it, including the costs of flagging, traffic control, inspection, "signage," barriers, and removal of small debris. He also stated that water caused tremendous damage to Public Highways 24 and 61 during the flood of 1993.

On cross-examination by Fabius, Mundle acknowledged that he is not an engineer or degreed technician, that he has never experienced a "flood event" in or near Fabius in the absence of levee protection, and that he has no experience in determining maintenance costs that would be required in the absence of a levee. Additionally, he admitted that saturation of a highway embankment would reduce the surface life of the roadway. He acknowledged that he did not provide to the commissioners any of MHTC's costs regarding flagging, traffic control, inspection, "signage," barriers, and removal of small debris.

When asked about his estimates for "clean-up," he stated that he only considered the cost to clean the surface of the roadway itself. He did not consider the culvert pipes, the size of the culverts, the number of miles of ditches in the district, or any state ditches or state culverts. Additionally, he assumed that very little sedimentation or sand would appear in the ditches or culverts. He did not account for the creeks or the North Fabius River, sandbar deposits occurring during flood events, the escaping of the Mississippi Riv-

er from its channel during major flood events, deposits of soil, sand, trees, and other debris, scouring that would occur along Public Highway 24, the cost of regrading or redefining the highway embankment, damage to the substrate of that highway caused by saturation for extended periods of time, or the extent to which such saturation would shorten the life of the highway. In sum, with respect to both Public Highway 24 and Public Highway 61, Mundle testified that he only considered what it would cost to have a sweeper and some signs on the roadway.

Finally, MHTC presented the testimony of Rice, an employee of MODOT for thirty-three years. Referring to data obtained from the U.S. Corps of Engineers, he testified that between 1947 and 1998, but for the existence and operation of Fabius, Public Highways 24 and 61 would have been covered by water 32 days per year, on average.

On cross-examination by Fabius, Rice stated that he is not an engineer and acknowledged that almost 40% of the flooding that has occurred since 1947 occurred after 1985. He also stated that the frequency and duration of flooding has increased in recent times, especially since 1990, such that the average stated by him on direct examination would increase to approximately 42 days per year during the 1990's. Additionally, he testified that, since 1947, the river elevation has risen, more levees have been constructed throughout the area, and the peak water levels during flooding have increased.

When questioned about efficiency or maintenance costs associated with the flooding that would occur but for the existence and operation of Fabius, Rice acknowledged that he did not consider damage to the highways' pavement, substrate, and embankment, or any effects on the life span of those highways. He stated that he, too, like Mundle, did not consider other factors or costs, and did not provide his analysis to the commissioners when MHTC met with them during the assessment process. Additionally, he acknowledged that saturation of highway embankments leads to a reduced surface life and that he did not account for saturation in his figures.

Fabius then asked Rice what he thought MHTC would do if the levee and drainage system protecting Public Highways 24 and 61 did not exist. Although the fact that the highways would be closed approximately 42 days per year would "be a consideration," Rice suggested that MHTC would simply rely on "alternate routes" fifty to sixty miles away, even when flooding would prevent access to the hospital in Quincy. He acknowledged that in 1993, however, use of shuttle boats was preferable to requiring commuters to use alternate routes.

At the close of MHTC's case, Fabius moved to dismiss MHTC's exception for failure to sustain the burden of demonstrating that the commissioners' assessment lacked a rational basis or was arbitrary or capricious. The trial court, finding that there was a material change in the value of lands and properties protected by Fabius since the previous assessment in 1917, that the commissioners properly assessed benefits according to the increased physical efficiency and decreased maintenance cost of roadways derived from the protection of Fabius's levee and drainage system, and that MHTC's exception was "superficial," dismissed MHTC's exception and approved and affirmed the Commissioners' Report, subject to Fabius's remaining exception.

In light of the trial court's favorable ruling, Fabius withdrew its exception by leave, after which the trial court approved and affirmed the Commissioners' Report in its entirety. On November 12, 1999, the trial court entered its Judgment, Findings, and Order to that effect. MHTC then filed its Notice of Appeal on December 10, 1999.

## STANDARD OF REVIEW

On review of a court-tried case, we will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Webcon Group, Inc. v. S.M. Properties, L.P.*, 1 S.W.3d 538, 541 (Mo. App. E.D.1999); *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976); Rule 73.01(c). We defer to the trial court's determination of credibility, viewing the evidence and inferences therefrom in a light most favorable to the judgment and disregarding all contrary evidence and inferences. *Id.; Higgins v. Olson*, 991 S.W.2d 216, 218 (Mo.App. E.D.1999). The trial court determines the credibility of witnesses and may believe all, part or none of any witnesses' testimony. *Webcon Group, Inc. v. S.M. Properties, L.P.*, 1 S.W.3d at 541; Rule 73.01(c)(2).

## DISCUSSION

MHTC raises seven issues on appeal. It argues that the trial court erred in (1) failing to dismiss Fabius's petition because the proposed assessment against MHTC is an unconstitutional diversion of state road funds; (2) approving Fabius's assessment against MHTC because the assessment constitutes a tax and there has been no referendum; (3) sustaining Fabius's assessment against MHTC because it constitutes an unconstitutional tax against the state; (4) failing to dismiss Fabius's petition against MHTC because the proposed assessment against MHTC has no specific statutory authorization and is thus invalid; (5) entering a ruling that prejudiced MHTC by preventing discovery and thus prevented MHTC from properly preparing its case for trial; (6) denying MHTC's request for a jury trial; and (7) approving Fabius's assessment against MHTC because the assessment is inconsistent with other trial court findings, is not proportionate with other assessments in the district, is unconstitutional and is against the weight of the evidence.

Each of these issues will be discussed, in turn.

### Unconstitutional Diversion of State Road Funds

MHTC first argues that the trial court erred in failing to dismiss Fabius's petition because the assessment against MHTC is an unconstitutional diversion of state road funds.

Article IV, §§ 29 and 30 of the Missouri Constitution provide for the establishment of MHTC, for the creation of the state road fund and for limitations on the expenditure of state road funds. Article IV, § 30(b) provides in part:

> For the purpose of constructing and maintaining an adequate system of connected state highways all state revenue derived from highway users as an incident to their use or right to use the highways of the state, including all state license fees and taxes upon motor vehicles, trailers and motor vehicle fuels and upon, with respect to, or on the privilege of the manufacture, receipt, storage, distribution, sale or use thereof ... shall be credited to the state road fund and stand appropriated without legislative action for the following purposes and no other.

Two of the enumerated purposes for which those funds shall be expended include maintaining the state system of highways and "such other purposes and contingencies relating and appertaining to the construction and maintenance of such highways." Mo. Const. Art. IV, § 30(b), ¶ 2, sub-¶¶ (1), (5). Section 226.220, the statute that creates and establishes state road funds, provides that those funds shall be used for, *inter alia*, "maintaining state highways in the systems specified in article IV, section 30(b) of the constitution." Section 226.220.2.

Section 242.260(3), however, provides that in assessing the benefits to land within the drainage district, the commission shall assess "[t]he public highways, rail-

road and other rights-of-way, roadways, railroad and other property ... according to the increased physical efficiency and decreased maintenance cost of roadways by reason of the protection to be derived from the proposed works and improvements."

 The primary rule of statutory interpretation requires the court to ascertain the legislative intent by considering the plain and ordinary meaning of the words in the statute. *McNally v. St. Louis County Police Dept.*, 17 S.W.3d 614, 616 (Mo.App. E.D.2000). Each word, clause, sentence, and section of a statute should be given meaning. *Hoffman v. Van Pak Corp.*, 16 S.W.3d 684, 689 (Mo.App. E.D.2000). Statutes are construed together and harmonized if possible. *Auto Alarm Supply Corp. v. Lou Fusz Motor Co.*, 986 S.W.2d 467, 469 (Mo.App. E.D.1998) (citation omitted). Considering the entire legislative scheme and the plain meaning of the language used, the court must attempt to harmonize each statutory enactment. *Farmers' Elec. Co-op., Inc. v. Missouri Dept. of Corrections,* 977 S.W.2d 266, 270 (Mo. banc 1998).

Though Section 226.220 does not specifically authorize state road funds to be used to pay drainage district assessments, it does authorize those funds to be used to maintain state highways and for "other purposes and contingencies relating and appertaining to the construction and maintenance of such highways." Construing this language with that of Section 242.260.3, which provides the method the Commissioners should use in making assessments against public roadways, we find that the legislature must have intended for the "other purposes and contingencies" relating to the maintenance of state highways to include drainage district assessments for benefits conferred.[5] Any other construction would nullify the language found in Section 242.260.3 and

would require the legislature to have intended a useless act by instructing the Commissioners to assess the benefits conferred upon public roadways.

Furthermore, this case merely involves a judgment against MHTC, not a diversion of state road funds. MHTC can and does receive other funds that are not as restricted. MHTC conceded at oral argument before this Court that it had access to general revenue funds. Point denied.

### Violation of Hancock Amendment

 MHTC next argues that the court erred in approving the assessment against MHTC because the assessment constitutes a tax, and there has been no referendum in violation of the Hancock Amendment to the Missouri Constitution.

The Missouri Constitution, as modified by the Hancock Amendment, reads as follows:

Counties and other political subdivisions are hereby prohibited from levying any tax, license or fees, not authorized by law, charter or self-enforcing provisions of the constitution when this section is adopted ... without the approval of the required majority of the qualified voters of that county or other political subdivision.

Mo. Const. Art. X, section 22.

 "Only 'total state revenues' are subject to Hancock Amendment refunds." *Missouri Ass'n of Counties v. Wilson,* 3 S.W.3d 772, 774 (Mo. banc 1999); Mo. Const. Art. X, Sections 17–18. To qualify as total state revenues, "(1) the funds must be received into the state treasury, and (2) the funds must be subject to appropriation." *Id.,* citing *Kelly v. Hanson,* 959 S.W.2d 107, 111 (Mo. banc 1997). The Missouri Supreme Court has rejected the contention that all fees, whether user fees or tax-fees, are subject to the Hancock

---

5. This construction is fully consistent with the requirements of Article IV, § 30(b) of the Mis-

souri Constitution.

Amendment. *Mullenix–St. Charles Properties, L.P. v. City of St. Charles*, 983 S.W.2d 550, 561 (Mo.App. E.D.1998), citing *Keller v. Marion County Ambulance Dist.*, 820 S.W.2d 301, 304 (Mo. banc 1991). Rather, the Hancock Amendment applies *only* to revenue increases that are in fact tax increases, whether labeled as taxes, licenses, or fees. *Id.* "Revenue increases which are in fact fees for services rendered in connection with specific services ordinarily are not taxes unless the object of the requirement is to raise revenue to be paid into the general fund of the government." *Id.*[6]

In *Keller v. Marion County Ambulance Dist.*, 820 S.W.2d at 311 n. 10, the Missouri Supreme Court articulated five factors to be applied in determining whether a revenue increase by a local government is an increase in a "tax, license or fees" that requires voter approval under the Hancock Amendment:

1) When is the fee paid?—Fees subject to the Hancock Amendment are likely due to be paid on a periodic basis while fees not subject to the Hancock Amendment are likely due to be paid only on or after provision of a good or service to the individual paying the fee.

2) Who pays the fee?—A fee subject to the Hancock Amendment is likely to be blanket-billed to all or almost all of the residents of the political subdivision while a fee not subject to the Hancock Amendment is likely to be charged only to those who actually use the good or service for which the fee is charged.

3) Is the amount of the fee to be paid affected by the level of goods or services provided to the fee payer?—Fees subject to the Hancock Amendment are less likely to be dependent on the level of goods or services provided to the fee payer while fees not subject to the Hancock Amendment are likely to be dependent on the level of goods or services provided to the fee payer.

4) Is the government providing a service or good?—If the government is providing a good or a service, or permission to use government property, the fee is less likely to be subject to the Hancock Amendment. If there is no good or service being provided, or someone unconnected with the government is providing the good or service, then any charge required by and paid to a local government is probably subject to the Hancock Amendment.

5) Has the activity historically and exclusively been provided by the government?—If the government has historically and exclusively provided the good, service, permission or activity, the fee is likely subject to the Hancock Amendment. If the government has not historically and exclusively provided the good, service, permission or activity, then any charge is probably not subject to the Hancock Amendment.

In applying these criteria, it is evident that the special assessments at issue are not a tax in violation of the Hancock Amendment. Here, Fabius is providing a service to the property owners in the district and the amount of the assessments is determined by the benefit conferred on them. Furthermore, Missouri courts have held that similar assessments are not "taxes" within the meaning used in the Missouri Constitution. See *State ex rel. Drainage Dist. No. 28 of New Madrid County v. Thompson*, 328 Mo. 728, 41

6. The Missouri Supreme Court has stated:

"Taxes are 'proportional contributions imposed by the state upon individuals for the support of government and for all public needs' ... Taxes are not payments for a special privilege or a special service rendered ... Fees or charges prescribed by law to be paid by certain individuals to public officers for services rendered in connection with a specific purpose ordinarily are not taxes ... unless the object of the requirement is to raise revenue to be paid into the general fund of the government to defray customary governmental expenditures ... rather than compensation of public officers for particular services rendered...."

*Zahner v. City of Perryville,* 813 S.W.2d 855, 859 (Mo. banc 1991).

S.W.2d 941, 945 (banc 1931) (holding that assessments levied by a drainage district to pay for local improvements are not taxes); *Zahner v. City of Perryville*, 813 S.W.2d at 859 (holding that an assessment "for specific purposes and not intended to be paid into the general fund to defray general public needs or governmental expenditures is not a tax"); and *Egyptian Levee Co. v. Hardin*, 27 Mo. 495 (Mo.1858) (holding that amounts raised to be expended on the property assessed are not taxes). Point denied.

### Tax Against the State

■ MHTC next argues that the trial court erred in sustaining the assessment against MHTC because it constitutes a tax against the State in violation of the Missouri Constitution.

■ Article X, § 6, provides that all property, real and personal, of the State shall be exempt from taxation. If the State is the property owner, there is a presumption that the property is exempt. The Missouri Supreme Court has stated:

"The general doctrine is that tax exemption statutes should be strictly construed because taxes are imposed on the whole citizenry for the support of the government, and exemptions are discriminatory .... but as to property owned by the State or any of its political subdivisions, the doctrine is reversed. There taxation is the exception and not the rule. The State in its Constitution expressly exempts its own property."

*State ex rel. Cairo Bridge Commission v. Mitchell*, 352 Mo. 1136, 181 S.W.2d 496, 499 (Mo. banc 1944). However, the exemption from taxation has been construed to exempt state property from real estate taxes for general purposes but not from special assessments for local improvements. *Walker v. Missouri Department of Natural Resources*, 28 S.W.3d 460, 461 (Mo.App. E.D. 2000),[7] citing *City of Clinton v. Henry County*, 115 Mo. 557, 22 S.W. 494, 495 (1893). "The question is one of delegated power, not exemption from taxation." *Id.* Accordingly, the legislature must exercise such delegation by express enactment or clear implication. *Id.* "Language allowing assessment against properties generally is insufficient to impose liability on property owned by the state." *Id.*

Section 242.260 provides, in pertinent part, as follows:

(2) The commissioners shall proceed to view the premises and determine the value of all land and other property, within or without the district.... They shall assess the amount of benefits, and the amount of damages, if any, that will accrue to each governmental lot, ... public highways, railroad and other rights-of-way, railroad roadways and other property from carrying out and putting into effect the plan for reclamation heretofore adopted.

(3) The commissioners in assessing the benefits to lands, public highways, railroad and other rights-of-way, railroad roadways and other property not traversed by such works and improvements ..., shall assess only such benefits as will be derived from the construction of the works and improvements set out in the plan for reclamation.... The public highways, railroad and other rights-of-way, roadways, railroad and

---

7. This Court recently decided in *Walker v. Missouri Department of Natural Resources*, 28 S.W.3d 460 (Mo.App. E.D. 2000), that a drainage district does not have the authority to levy an assessment against property owned by the State without specific statutory authorization. In that case, Chapter 243 was at issue. Chapter 243 governs drainage districts formed by counties. It authorizes drainage districts to collect assessments for public roadways from the county, and thus no authorization exists for an assessment against the State. Chapter 242, which is at issue in the case at bar, governs drainage districts formed by courts. It contains no such limiting provision, which implies instead that the governmental agency owning the benefited land is responsible for the assessment. See Section 242.260.

other property shall be assessed according to the increased physical efficiency and decreased maintenance cost of roadways by reason of the protection to be derived from the proposed works and improvements.

Chapter 242, then, by its very language, anticipates that government land will be contained within the drainage district and provides the manner in which the assessment should be determined. The Missouri Supreme Court construed Section 4390, R.S.1919, the predecessor to Section 242.260:

It is therefore clearly apparent, we think, that the Legislature, in the enactment of the Circuit Court Drainage Law (article 1, c. 28, Rev. Stat.1919) created a positive right, in favor of the drainage district, to the assessment of accruing benefits against the public roads and highways located within the boundaries of the drainage district.

* * *

[I]t is within the power of the Legislature to say and to provide that public property may be benefited by public improvements and accordingly assessed or charged with its proportionate share of the benefits accruing from such public improvements.

*Harrison and Mercer County Drainage Dist. v. Trail Creek Tp.*, 317 Mo. 933, 946–47, 297 S.W. 1, 6–7 (Mo.1927).

Though the only remedy for failure to pay assessments found in Chapter 242 is a lien on the property and possibility of foreclosure, the Court in *Harrison* determined that when the legislature fails to provide an adequate and appropriate statutory remedy, the plaintiff drainage district may resort to other common law remedies, including legal action. The Court reasoned as follows:

Inasmuch as the lien provided and declared by section 4399 and 4400, R.S. 1919, supra, is unenforceable (by foreclosure and sale) against the public roads

and highways because of public policy, it follows that the Legislature, apparently through mere inadvertence, has failed to provide by or in the statute an adequate and appropriate remedy for the enforcement of the positive right created by the statute. But it does not follow therefrom that the plaintiff, drainage district, is remediless and impotent to enforce the positive right created by the statute in its favor, for, where no adequate and appropriate remedy is provided for the enforcement of the created right, the drainage district may resort to any existing remedy at common law that will afford it adequate and proper redress, and the usual and ordinary remedy is an action, and a general judgment therein, against the political or governmental subdivision of the state chargeable with the maintenance, repair, and upkeep of the public roads and highways, whatever its corporate name or identity may be. Any other conclusion on our part would amount to an utter absurdity, for it is inconceivable to our minds that the Legislature shall have declared in positive language that accruing benefits shall be assessed against the public roads and highways without also intending that such positive right so created shall be enforceable by some appropriate, adequate, and effective remedy known to the law; otherwise, the positive right created would amount to nothing more than a scrap of paper, a mere dead letter, and a lifeless thing.

*Id.* at 947, 297 S.W. at 7.

The assessment against lands owned by MHTC in the case at bar is authorized by Section 242.260 and therefore does not violate the Missouri Constitution. Point denied.

### No Specific Statutory Authority

MHTC next argues that no specific statutory authority exists for benefits to be assessed against MHTC because MHTC's name does not appear in the statute. We disagree.

█ Section 242.260(3) expressly provides that public highways, rights-of-way, and roadways "shall be assessed." The plain meaning of this language indicates that the governmental entity responsible for the thoroughfare at issue is liable for the assessments. *See Harrison and Mercer County,* 297 S.W. at 6 (the legislature "created a positive right, in favor of the drainage district, to the assessment of accruing benefits against the public roads and highways located within the boundaries of the drainage district"). Point denied.

### Interrogatories and Jury Trial

█ In its fifth and sixth points on appeal, MHTC argues that the trial court erred in sustaining Fabius's Motion to Strike Interrogatories and in denying MHTC's request for a jury trial.

The Missouri Supreme Court has described Chapter 242 as "a code unto itself" that "fixes the rights and liabilities of all with respect to matters involved" and "grants and withholds power and authority, accordingly as it may be provided therein." *State ex rel. Powell v. Capps,* 381 S.W.2d 852, 856 (Mo.1964), citing *State ex rel. Walker v. Locust Creek Drainage District,* 228 Mo.App. 434, 67 S.W.2d 840, 847 (1934); *Dalton v. Fabius River Drainage Dist.,* 238 Mo.App. 655, 184 S.W.2d 776, 784 (1945).

The provision at issue, Section 242.280.1, provides that all exceptions shall be heard and determined by the trial court in a summary manner in order to "carry out liberally the purposes and needs of the district." The Missouri Supreme Court defined "summary manner" in *Birmingham Drainage District v. Chicago, B. & Q.R. Co.,* 274 Mo. 140, 202 S.W. 404, 408 (1917) as "forthwith and without regard to the established course of legal proceeding." As such, the term "summary manner" does not envisage the use of standard discovery mechanisms or jury trials. *See* e.g., *Sample's Estate v. Travelers Indem. Co.,* 603 S.W.2d 942, 945 (Mo.

1980) (trial court proceedings that include a jury trial are not conducted in a "summary manner"). Therefore, the trial court was within its discretion in sustaining Fabius's Motion to Strike Interrogatories and in denying MHTC's request for a jury trial. Point denied.

### Assessment is Inconsistent and Not Proportionate

MHTC argues lastly that the Report of Commissioners filed on June 30, 1999, was arbitrary and unreasonable because the Commissioners did not limit themselves to matters of increased efficiency and decreased maintenance cost, but also included sums for shuttle boats used during the 1993 flood. MHTC argues that the assessment of benefits on the 9.3 miles of MHTC roadway contrast starkly with the assessments for Lewis County and Marion County. This argument is devoid of merit.

As the previously stated facts reveal, substantial evidence supports the trial court's determination that the Commissioners' Report assessing benefits has a rational basis and is not arbitrary, unreasonable or capricious. Nothing in the record suggests that *similar* roadways in Lewis County and Marion County were assessed differently. Therefore, the trial court did not err in affirming the Commissioners' Report assessment of benefits.

The judgment of the trial court is affirmed.

SULLIVAN, P.J., and MOONEY, J., concur.